# 13-1289-bk(L)
## 13-1392-cv(CON)

IN THE

# United States Court of Appeals
### FOR THE SECOND CIRCUIT

———— ◆◆ ————

IN RE: BERNARD L. MADOFF INVESTMENT SECURITIES LLC,

————————————

IRVING H. PICARD, TRUSTEE FOR THE LIQUIDATION
OF BERNARD L. MADOFF INVESTMENT SECURITIES LLC,

*Plaintiff-Appellant,*

—against—

SECURITIES & INVESTMENT COMPANY BAHRAIN, HAREL INSURANCE
COMPANY, LTD., AXA PRIVATE MANAGEMENT, ST. STEPHEN'S SCHOOL, PACIFIC
WEST HEALTH MEDICAL CENTER, INC. EMPLOYEE'S RETIREMENT TRUST,

*Lead Plaintiffs-Appellees,*

(*caption continued on inside cover*)

————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

**BRIEF FOR PLAINTIFF-APPELLANT
IRVING H. PICARD, AS TRUSTEE FOR
THE SUBSTANTIVELY CONSOLIDATED SIPA LIQUIDATION
OF BERNARD L. MADOFF INVESTMENT SECURITIES
AND THE ESTATE OF BERNARD L. MADOFF**

---

DAVID B. RIVKIN, JR., ESQ.
LEE A. CASEY, ESQ.
MARK W. DELAQUIL, ESQ.
ANDREW M. GROSSMAN, ESQ.
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, NW
Washington, DC 20036
(202) 861-1500

DAVID J. SHEEHAN, ESQ.
DEBORAH H. RENNER, ESQ.
BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111
(212) 589-4200

*Attorneys for Plaintiff-Appellant Irving H. Picard, as Trustee
for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff
Investment Securities and The Estate of Bernard L. Madoff*

PASHA S. ANWAR, on behalf of themselves and all others similarly situated investors in the Greenwich Sentry, L.P. private investment limited partnership, JULIA ANWAR, on behalf of themselves and all others similarly situated investors in the Greenwich Sentry, L.P. private investment limited partnership, INTER-AMERICAN TRUST, ELVIRA 1950 TRUST, BONAIRE LIMITED, CARLOS GAUCH, LOANA LTD., WALL STREET SECURITIES, S.A., BANCO GENERAL, S.A., HARVEST DAWN INTERNATIONAL INC., EL PRADO TRADING, OMAWA INVESTMENT CORPORATION, CARMEL VENTURES LTD., TRACONCORP, BLYTHEL ASSOCIATED CORP., MARREKESH RESOURCES, CENTRO INSPECTION AGENCY, KALANDAR INTERNATIONAL, LANDVILLE CAPITAL MANAGEMENT S.A., 20/20 INVESTMENTS, AXA PRIVATE MANAGEMENT, DIVERSIFIED INVESTMENTS ASSOCIATES CLASS A UNITS, ABR CAPITAL FIXED OPTION/INCOME STRATEGIC FUND LP, HAREL INVESTMENT AND FINANCIAL SERVICES LTD., MIGUEL LOMELI, MORNING MIST HOLDINGS LIMITED, JITENDRA BHATIA, GOPAL BHATIA, KISHANCHAND BHATIA, JAYSHREE BHATIA, MANDAKINI GAJARIA, ABN AMRO LIFE S.A., BAHIA DEL RIO S.A., BEVINGTON MANAGEMENT, LTD., CALWELL INVESTMENT S.A., DIAMOND HILLS INC., HEDGE STRATEGY FUND LLC, KIVORY CORPORATION, NORTH CLUB, INC., PFA PENSION A/S, TAURUS THE FOURTH LTD., ZENN ASSETS HOLDING, LTD., CARLOS MATTOS, CHANDRASHEKAR GUPTA, DEEPA GUPTA, ULRICH BLASS, ROBERTO CIOCI, SANDRA MARCHI CIOCI, JOHN PAUL DOUGHERTY, E. THOMAS DOUGHERTY NOVELLA, MUNIANDY NALAIAH, LILA NEEMBERRY, PETER A. & RITA M. CARFAGNA IRREVOCABLE CHARITABLE REMAINDER UNITRUST, MOSHE PODHORZER, R. WICKNESWARI V. RATNAM, ENRIQUE SANTOS, ENRIQUE SANTOS CALDERON, JACQUELINE URZOLA, JOSEFINA SANTOS URZOLA, FELIPE J. BENAVIDES, FUNDACION VIRGILIO BARCO, DAVID HOPKINS, CATALINA MEJIA, CESAR MEJIA, R.M. RADEMAKER, THE ALPHA AND OMEGA PARTNERSHIP, LP, RICHMON COMPANY LTD., POSITANO INVESTMENT LTD.,

*Plaintiffs-Appellees,*

PACIFIC WEST HEALTH MEDICAL CENTER INC. EMPLOYEES RETIREMENT TRUST, On behalf of Itself, PACIFIC WEST HEALTH MEDICAL CENTER INC. EMPLOYEES RETIREMENT TRUST, on Behalf of All Others Similarly Situated, SHIMON LAOR, DAVID I. FERBER, THE KNIGHT SERVICES HOLDINGS LIMITED, on behalf of itself and all others similarly situated, FRANK E. PIERCE, FRANK E. PIERCE IRA, NADAV ZOHAR, on behalf of themselves and all others similarly situated, RONIT ZOHAR, FAIRFIELD SENTRY LTD., HEADWAY INVESTMENT CORP., BPV FINANCE (INTERNATIONAL) LTD., JOSE ANTONIO PUJALS, individually and in their representative capacities for all those similarly situated, ROSA JULIETA A DE PUJALS, individually and in their representative capacities for all those similarly situated, MARIDOM LIMITED, a Foreign Corporation, RICARDO LOPEZ, STANDARD CHARTERED BANK INTERNATIONAL (AMERICAS) LIMITED, STANCHART SECURITIES INTERNATIONAL, INC., MARIA AKRIBY VALLADOLID, RICARDO RODRIGUEZ CASO, WONG YUK HING DE LOU, MOISES LOU MARTINEZ, JOAQUINA TERESA BARBACHA HERRERO, SAND OVERSEAS

Limited, Sand Overseas Limited, Blockbend Ltd, Baymall Investments Ltd, Eastfork Assets Ltd, Gerico Investments, Inc., Alicia Gaviria Rivera, Eduardo Child Escobar, Mailand Investment Inc.,

*Consolidated Plaintiffs-Appellees,*

Arjan Mohandas Bhatia, Tradwaves, Ltd., Parasram Daryani, Neelam P. Daryani, Vikas P. Daryani, Nikesh P. Daryani, Ashokkumar Damodardas Raipancholia, Prerna Vinod Uttamchandani, Kishin Mohandas Bhatia, Suresh M. Bhatia, Bharat Mohandas, Aarvee Ltd., Dilip Damodardas Raipancholia, Rajeshkumar Damodardas Raipancholia, Kishu Nathurmal Uttamchandani, Rajendrakumar Patel, Vandna Patel,

*All Plaintiffs-Appellees.*

—against—

Fairfield Greenwich Limited, Fairfield Greenwich (Bermuda), Pacific West Medical Center Employees Retirement Trust, Harel Insurance Company Ltd., Martin and Shirley Bach Family Trust, Natalia Hatgis, Securities and Investment Company Bahrain, Dawson Bypass Trust, St. Stephen's School, Walter M. Noel, Jr., Jeffrey H. Tucker, Andres Piedrahita, Lourdes Barreneche, Robert Blum, Cornelis Boele, Gregory Bowes, Vianney D'hendecourt, Yanko della Schiava, Harold Greisman, Jacqueline Harary, David Horn, Richard Landsberger, Daniel E. Lipton, Julia Luongo, Mark Mckeefry, Charles Murphy, Corina Noel Piedrahita, Maria Theresa Pulido Mendoza, Santiago Reyes, Andrew Smith, Philip Toub, Amit Vijayvergiya,

*Defendants-Appellees,*

Yanko Dellaw Schiava, Philip Toub, Lourdes Barreneche, Cornelis Boele, Matthew C. Brown, Vianney D'hendecourt, Harold Greisman, Jacqueline Harary, David Horn, Richard Landsberger, David Lipton, Julia Luongo, Mark Mckeefry, Maria Teresa Pulido Mendozo, Charles Murphy, Santiago Reyes, Andrew Smith, CITCO Bank Nederland N.V. Dublin Branch, GlobeOp Financial Services LLC., Citco Canada Inc., Pricewaterhouse Coopers Accountants N.V., Greenwich Sentry, L.P., Fairfield Sentry Limited, Citgo Global Custody N.V., Pricewaterhousecoopers International Limited, Pricewaterhousecoopers LLP (US), Pricewaterhousecoopers LLP Chartered Accountants, Fairfield Greenwich (Bermuda) Limited, Fairfield Greenwich Advisors, L.L.C., Fairfield International Managers, Inc., Daniel Lipton, Jacqueline Hararay, Robert Blum, Standard Chartered International (USA) Ltd., Standard Chartered PLC, American Express Bank Ltd., Standard Chartered Bank International (Americas) Limited, a Foreign entity, Standard Chartered Private Bank, Foreign entity, and a private banking division of

Standard Chartered Bank, STANDARD CHARTERED BANK, GREGORY BOWES, STANDARD CHARTERED BANK INTERNATIONAL (AMERICAS) LIMITED,

*Consolidated Defendants-Appellees,*

FAIRFIELD GREENWICH CORP.,

*Consolidated Counter Defendant-Appellee,*

1-20 JOHN DOES,

*Defendants,*

SECURITIES INVESTOR PROTECTION CORPORATION,

*Intervenor.*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, undersigned counsel for the Appellant Irving H. Picard, as trustee for the liquidation of Bernard L. Madoff Investment Securities LLC and the substantively consolidated estate of Bernard L. Madoff ("Trustee"), hereby certifies that the Appellant has no parent corporation and that no publicly held corporation holds 10 percent or more of its stock.

/s/    David J. Sheehan<br>
DAVID J. SHEEHAN

# TABLE OF CONTENTS

<u>**Page**</u>

GLOSSARY ..................................................................xi-xii

INTRODUCTION...................................................... 1

JURISDICTIONAL STATEMENT ............................... 3

STATEMENT OF ISSUES........................................... 5

STATEMENT OF THE CASE ...................................... 6

      A.    The Securities Investor Protection Act........................ 7

      B.    The Madoff Fraud and the Recovery Effort ................ 9

      C.    The Trustee's Recovery Action Against the Fairfield Funds and Their Principals and Affiliates ................................................................ 11

      D.    The Anwar Action ........................................ 14

      E.    The Anwar Settlement Dissipates the Same Assets Sought by the Trustee ................................... 17

      F.    Procedural History ....................................... 19

            1.    The Trustee's Injunction Action ....................... 19

            2.    The Trustee Seeks To Intervene in the Anwar Action To Stay Consideration of the Settlement .......................................... 21

SUMMARY OF ARGUMENT .................................... 22

STANDARD OF REVIEW.......................................... 27

ARGUMENT ......................................................... 29

    I.    The District Court Erred in Holding That a Section 105 Injunction Was Legally Unavailable .................................. 29

      A.    A Section 105 Injunction Is Available To Prevent the Settlement from Impeding the Liquidation of BLMIS ....................................................... 30

      B.    A Section 105 Injunction Is Appropriate Here........... 35

    II.    The Settlement Is Inconsistent with SIPA........................... 39

# TABLE OF CONTENTS
(continued)

$$\underline{\textbf{Page}}$$

    A.    Congress Intended SIPA To Displace Laws That Would Conflict with the "Prompt and Orderly" Liquidation of Failed Brokerages for Their Customers' Benefit ....................................... 39

    B.    The Settlement Resolves the Plaintiffs' State Law Claims in a Manner That Conflicts with Federal Law ................................................................. 44

    C.    The Settlement Resolves the Plaintiffs' Exchange Act Claims in a Manner That Conflicts with SIPA .... 48

    D.    SIPA Requires an Injunction or Stay of the Settlement ................................................................ 51

III.    The Settlement Violates the Automatic Stay ...................... 54

IV.    The Trustee's Injunction Action Is Not Barred by Laches ................................................................................ 59

    A.    The District Court's Application of Laches to the Trustee's Section 105 Claim Was *Per Se* Abuse of Discretion ................................................................ 61

    B.    The District Court Ignored the Anwar Plaintiffs' Unclean Hands ........................................................ 63

    C.    Notice and Negotiation Bar Laches ............................ 64

    D.    Laches Does Not Apply to Enforcement of the Automatic Stay ........................................................ 67

CONCLUSION ........................................................................ 68

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*48th St. Steakhouse, Inc. v. Rockefeller Grp., Inc. (In re 48th St. Steakhouse, Inc.)*,
835 F.2d 427 (2d Cir. 1987) ................................................................ 57

*A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*,
960 F.2d 1020 (Fed. Cir. 1992) ..................................................... 64, 66

*ACandS, Inc. v. Travelers Cas. & Sur. Co.*,
435 F.3d 252 (3d Cir. 2006) ............................................................... 67

*In re Adelphia Commc'ns Corp.*,
298 B.R. 49 (S.D.N.Y. 2003) .............................................................. 35

*In re Application of Malev Hungarian Airlines*,
964 F.2d 97 (2d Cir. 1992) ........................................................... 28, 64

*In re Becker*,
407 F.3d 89 (2d Cir. 2005) ................................................................ 59

*In re Bernard L. Madoff Inv. Secs. LLC*,
654 F.3d 229 (2d Cir. 2011) ........................................................ 10, 11

*Brown v. Armstrong*,
949 F.2d 1007 (8th Cir. 1991) ........................................................... 58

*In re Bullion Reserve of N. Am.*,
836 F.2d 1214 (9th Cir. 1988) ........................................................... 37

*California v. ARC Am. Corp.*,
490 U.S. 93 (1989) ...................................................................... 44, 46

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
511 U.S. 164 (1994) .......................................................................... 49

# TABLE OF AUTHORITIES
### *(continued)*

**Page(s)**

*Cnty. of Suffolk v. Long Island Lighting Co.*,
   907 F.2d 1295 (2d Cir. 1990) ....................................................... 28

*Cohen v. Viray*,
   622 F.3d 188 (2d Cir. 2010) .......................................................... 52

*In re Commonwealth Oil Ref. Co., Inc.*,
   805 F.2d 1175 (5th Cir. 1986) ...................................................... 54

*In re Dairy Mart Convenience Stores, Inc.*,
   411 F.3d 367 (2d Cir. 2005) ..................................................... 51, 52

*Denney v. Deutsche Bank AG*,
   443 F.3d 253 (2d Cir. 2006) .......................................................... 29

*DSI Assocs. LLC v. United States*,
   496 F.3d 175 (2d Cir. 2007) .......................................................... 28

*E. Equip. & Servs. Corp. v. Factory Point Nat'l Bank, Bennington*,
   236 F.3d 117 (2d Cir. 2001) .......................................................... 41

*Eastern Refractories Co. Inc. v. Forty Eight Insulations Inc.*,
   157 F.3d 169 (2d Cir. 1998) .......................................................... 68

*EEOC v. Local 638*,
   753 F.2d 1172 (2d Cir. 1985), *aff'd, Local 28 v. EEOC*, 478 U.S.
   421 (1986) ...................................................................................... 65

*FDIC v. Hirsch (In re Colonial Realty Co.)*,
   980 F.2d 125 (2d Cir. 1992) ................................................. 55, 56, 58

*Fisher v. Apostolou*,
   155 F.3d 876 (7th Cir. 1998) ............................................... 32, 33, 36

*Fox v. Picard*,
   848 F. Supp. 2d 469 (S.D.N.Y. 2012) ...................................... 34, 59

*Garrity v. Leffler (In re Neuman)*,
   71 B.R. 567 (S.D.N.Y. 1987) ........................................................ 35

iv

## TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

*Gonzalez Hernandez v. Borgos,*
    343 F.2d 802 (1st Cir. 1965) ........................................................ 32, 33

*Hermès Int'l v. Lederer de Paris Fifth Ave., Inc.,*
    219 F.3d 104 (2d Cir. 2000) ......................................................... 28, 64

*Hutton Constr. Co., Inc., v. Cnty. of Rockland,*
    52 F.3d 1191 (2d Cir. 1995) ............................................................... 65

*In re Ira Haupt & Co.,*
    287 F. Supp. 318 (S.D.N.Y. 1968) ....................................................... 43

*In re Ira Haupt & Co.,*
    361 F.2d 164 (2d Cir. 1966) ............................................................... 43

*Ivani Contracting Corp. v. City of New York,*
    103 F.3d 257 (2d Cir. 1997) ............................................................... 28

*Lautenberg Found. v. Picard,*
    No. 11-5421, 2013 WL 616269 (2d Cir. Feb. 20, 2013) ............. *passim*

*LTV Steel Co., Inc. v. Bd. of Educ. (In re Chateaugay Corp.),*
    93 B.R. 26 (S.D.N.Y. 1988) ............................................................... 35

*MacArthur Co. v. Johns-Manville Corp.,*
    837 F.2d 89 (2d Cir. 1988) ................................................................ 30

*Mittendorf v. J. R. Williston & Beane Inc.,*
    372 F. Supp. 821 (S.D.N.Y. 1974) ..................................................... 42

*Mogavero v. McLucas,*
    543 F.2d 1081 (4th Cir. 1976) ........................................................... 67

*Neilson v. Colgate-Palmolive Co.,*
    199 F.3d 642 (2d Cir. 1999) ............................................................... 28

*NML Capital v. Republic of Argentina,*
    699 F.3d 246 (2d Cir. 2012) ............................................................... 65

**TABLE OF AUTHORITIES**
*(continued)*

**Page(s)**

*O'Donnell v. Royal Bus. Group, Inc. (In re Oxford Homes, Inc.)*,
  180 B.R. 1 (Bankr. D. Me. 1995)........................................................32

*Palmdale Hills Prop., LLC v. Lehman Commercial Paper, Inc. (In
  re Palmdale Hills Prop., LLC)*,
  654 F.3d 868 (9th Cir. 2011)...........................................................28

*Picard v. Fairfield Sentry Ltd.*,
  No. 09-1239 (Bankr. S.D.N.Y. filed May 18, 2009) ...........................12

*Picard v. Maxam Absolute Return Fund, L.P.*,
  460 B.R. 106 (Bankr. S.D.N.Y. 2011), *aff'd*, 474 B.R. 76
  (S.D.N.Y. 2012) ...........................................................................34

*Picard v. Merkin*,
  440 B.R. 243 (Bankr. S.D.N.Y. 2010) ..............................................34

*Picard v. Stahl*,
  443 B.R. 295 (Bankr. S.D.N.Y. 2011) ..............................................34

*Potash Co. of Am. v. Int'l Minerals & Chem. Corp.*,
  213 F.2d 153 (10th Cir. 1954).....................................................63, 64

*ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic*,
  314 F.3d 62 (2d Cir. 2002) ...............................................................62

*Publicker Indus. Inc. v. United States (In re Cuyahoga Equip.
  Corp.)*,
  980 F.2d 110 (2d Cir. 1992) .............................................................33

*Queenie, Ltd. v. Nygard Int'l*,
  321 F.3d 282 (2d Cir. 2003) .............................................................31

*In re Quigley Co., Inc.*,
  676 F.3d 45 (2d Cir. 2012) .........................................................24, 30

*Reliant Energy Servs., Inc. v. Enron Canada Corp.*,
  349 F.3d 816 (5th Cir. 2003)............................................................28

# TABLE OF AUTHORITIES
### *(continued)*

<u>Page(s)</u>

*Republic of Philippines v. Marcos,*
806 F.2d 344 (2d Cir. 1986) .............................................................. 30

*Robertson v. Nat'l Basketball Ass'n,*
556 F.2d 682 (2d Cir. 1977) .............................................................. 52

*Rothensies v. Elec. Storage Battery Co.,*
329 U.S. 296 (1946) .......................................................................... 59

*In re Saunders,*
101 B.R. 303 (N.D. Fla. 1989) ..................................................... 55, 56

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,*
454 B.R. 285 (Bankr. S.D.N.Y. 2011) ............................................... 37

*SEC v. Brennan,*
230 F.3d 65 (2d Cir. 2000) ................................................................ 58

*Shimer v. Fugazy (In re Fugazy Express, Inc.),*
982 F.2d 769 (2d Cir. 1992) .............................................................. 67

*Sosne v. Reinert & Duree, P.C. (In re Just Brakes Corporate Sys., Inc.),*
108 F.3d 881 (8th Cir. 1997) ............................................................. 58

*Stone v. Williams,*
873 F.2d 620 (2d Cir.), *vacated on reh'g on other grounds*, 891
F.2d 401 (2d Cir. 1989) .................................................................. 66

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta,*
552 U.S. 148 (2008) ..................................................................... 48, 49

*Stupak-Thrall v. Glickman,*
226 F.3d 467 (6th Cir. 2000) ............................................................. 54

*Sykes v. Anderson,*
625 F.3d 294 (6th Cir. 2010) ............................................................. 62

*Texaco Puerto Rico, Inc. v. Dep't of Consumer Affairs,*
60 F.3d 867 (1st Cir. 1995) ............................................................... 52

## TABLE OF AUTHORITIES
### *(continued)*

**Page(s)**

*UBS Fin. Servs., Inc. v. W. Va. Univ. Hosps., Inc.*,
  660 F.3d 643 (2d Cir. 2011) ...................................................... 27, 28

*United Merchs. & Mfrs., Inc. v. K. Gimbel Accessories, Inc.*,
  294 F. Supp. 151 (S.D.N.Y. 1968) ......................................................66

*United States v. Colasuonno*,
  697 F.3d 164 (2d Cir. 2012) ..............................................................28

*United States v. Dwyer*,
  539 F.2d 924 (2d Cir. 1976) ..............................................................62

*United States v. Estate of Romani*,
  523 U.S. 517 (1998) ..................................................................... 49, 50

*United States v. Oddo*,
  314 F.2d 115 (2d Cir. 1963) ..............................................................63

*Unsecured Creditors' Comm. of DeLorean Motor Co. v. DeLorean
  (In re DeLorean Motor Co.)*,
  755 F.2d 1223 (6th Cir. 1985) ............................................... 31, 32, 36

*Veltri v. Bldg. Serv. 32B-J Pension Fund*,
  393 F.3d 318 (2d Cir. 2004) .................................................. 60, 64, 65

*Watt v. Alaska*,
  451 U.S. 259 (1981) ...........................................................................51

**STATUTES**

11 U.S.C. § 105 ............................................................................. *passim*

11 U.S.C. § 362(a) ......................................................................... *passim*

11 U.S.C. § 542(a) .................................................................................34

15 U.S.C. § 78eee...............................................................................3, 4

15 U.S.C. § 78fff......................................................................... 30, 43, 47

# TABLE OF AUTHORITIES
## *(continued)*

**Page(s)**

15 U.S.C. § 78fff-1 .................................................................... 41, 45

15 U.S.C. § 78fff-2 ..................................................................... *passim*

15 U.S.C. § 78*lll*.................................................................... 8, 42, 45

18 U.S.C. § 1961(c) ............................................................................ 36

18 U.S.C. § 1964(c) ............................................................................ 36

28 U.S.C. § 157(d) ............................................................................... 4

28 U.S.C. § 158(d) ............................................................................... 4

28 U.S.C. § 1291 .............................................................................. 4, 5

28 U.S.C. § 1331 .................................................................................. 4

28 U.S.C. § 1332 .................................................................................. 4

28 U.S.C. § 1334(b) ............................................................................. 3

## RULES

Fed. R. Civ. P. 24.............................................................................. 53

Fed. R. Civ. P. 65.............................................................................. 35

Fed. R. Civ. P. 83(b)......................................................................... 53

## OTHER AUTHORITIES

116 Cong. Rec. 39,352 (1970) ........................................................ 43

Securities Investor Protection: Hearings Before the Subcomm. on
    Commerce & Fin. of the H. Comm. on Interstate & Foreign
    Comm., 91st Cong. 91-67 (1970)............................................. 42

H.R. Rep. No. 91-1613 (1970), *reprinted in* 1970 U.S.C.C.A.N.
    5254............................................................................... 9, 42, 47

H.R. Rep. No. 95-595, *reprinted in* 1978 U.S.C.C.A.N. 5787 ................ 56

# TABLE OF AUTHORITIES
## *(continued)*

**Page(s)**

H.R. Rep. No. 95-746 (1977) ..................................................................... 42

Report of Special Study of Securities Markets of the SEC, H.R.
    Doc. No. 88-95, pt. 1 ........................................................................ 41

The Madoff Recovery Initiative,
    http://www.madofftrustee.com/claims-03.html ............................. 10, 11

U.S. Const. art. VI, cl. 2 ......................................................................... 44

x

# GLOSSARY

| | |
|---|---|
| A- | Joint Appendix |
| Anwar Action | A class action, brought by the Anwar Plaintiffs against the Fairfield Defendants and others, in which the Trustee sought to intervene |
| Anwar Plaintiffs | The plaintiff class of investors in the Fairfield Funds |
| Bankruptcy Code | 11 U.S.C. §§ 101 *et seq.* |
| BLMIS | Bernard L. Madoff Investment Securities LLC |
| Fairfield Defendants | Persons associated with the Fairfield Funds who are defendants in the Trustee's Recovery Action and the Anwar Action |
| Fairfield Funds | Fairfield Sentry Limited, Fairfield Sigma Limited, Fairfield Lambda Limited, Greenwich Sentry L.P, and Greenwich Sentry Partners, L.P. |
| Injunction Action | The Trustee's action to enjoin consummation of the settlement between the Anwar Plaintiffs and the Fairfield Defendants, No. 13-1289 |
| Madoff | Bernard L. Madoff, principal of BLMIS |
| Recovery Action | The Trustee's ongoing action to recover BLMIS customer property from the Fairfield Defendants, *Picard v. Fairfield Sentry Limited*, No. 09-01239 (Bankr. S.D.N.Y. filed May 18, 2009) |

xi

| | |
|---|---|
| SIPA | Securities Investor Protection Act, 15 U.S.C. §§ 78aaa *et seq.* |
| SIPC | Securities Investor Protection Corporation |
| SPA- | Special Appendix |
| Trustee | Irving H. Picard, as trustee pursuant to SIPA for the liquidation of the business of BLMIS, substantively consolidated with the estate of Bernard L. Madoff |

# **INTRODUCTION**

At the same time that the Madoff Trustee works to recover and return fraudulently conveyed assets to the customers of Bernard L. Madoff Investment Securities LLC ("BLMIS") through the Securities Investor Protection Act ("SIPA") liquidation proceeding, some investors injured by Madoff's fraud have attempted to circumvent that proceeding by asserting direct claims against parties holding those assets. This Court and others have consistently blocked such attempts as contrary to SIPA and the Bankruptcy Code. The automatic stay, as enforced and supplemented through Section 105 injunctions, ensures that potential estate assets sought by a trustee remain available for recovery.

Yet in this case, the court below held that there was no legal basis to block a settlement agreement that awards assets held by persons and entities associated with BLMIS feeder funds to those funds' investors, drawing down assets otherwise expected to return to the BLMIS estate. If not enjoined, this settlement will dissipate more than $50 million that should be distributed on an equitable basis to all BLMIS victims. It does this to accord preferential treatment to a group of investors who rushed to strike a settlement before the Trustee's own action against

the same defendants was complete.  They alone will enjoy a double recovery, as beneficiaries of both this settlement and the feeder funds' $267 million in allowed claims on the BLMIS estate.

That kind of result is precisely what Congress sought to avoid by enacting SIPA.  To end the chaos and inequities that inevitably follow the collapse of a brokerage due to fraud or mismanagement, Congress crafted a comprehensive remedial scheme for the protection of brokerage customers.  Central to that scheme is that a single trustee is empowered to recover a broadly-defined class of "customer property" on behalf of all customers and that customers are first in line to be made whole according to a statutory priority system.  As this Court has recognized, for SIPA to work as intended, the trustee's claims must go ahead of those who seek to claim customer property for themselves. The court below ignored this point.

Instead, the district court held the Trustee to an impossible standard.  The Trustee's action to enjoin the dissipation of funds he sought to recover was brought too soon, it held, because an injunction is available only after prevailing in an avoidance action.  That holding renders Section 105 completely ineffectual and conflicts with this

2

Court's recent decisions applying that provision. It even conflicts with the district court's alternative holding, that the Trustee was also too late because he engaged in settlement negotiations rather than sue on day one, and so was barred by laches. Under the district court's logic, when third parties attempt to collect from the same limited pool of assets as a bankruptcy trustee, the trustee can prevail only if he is first in time to settlement or judgment—*i.e.*, if he wins the race to the courthouse.

Accordingly, the Trustee respectfully requests that this Court reverse the decisions of the court below and act to enjoin the settling parties, or stay this settlement, from proceeding until the Trustee's recovery action is resolved.

## <u>JURISDICTIONAL STATEMENT</u>

Case No. 13-1289 (the "Injunction Action") was brought in the United States Bankruptcy Court for the Southern District of New York by Irving H. Picard, as trustee (the "Trustee") pursuant to SIPA for the liquidation of the business of BLMIS, substantively consolidated with the estate of Bernard L. Madoff. A-370. The bankruptcy court had subject matter jurisdiction pursuant to 28 U.S.C. § 1334(b) and 15

U.S.C. § 78eee(b)(2)(A), (b)(4). On February 6, 2013, the United States District Court for the Southern District of New York withdrew the Bankruptcy Court reference pursuant to 28 U.S.C. § 157(d). A-961. On March 20, the district court entered an order denying the Trustee's motion for a preliminary injunction and dismissing the action. SPA-1. On April 8, the Trustee timely filed a Notice of Appeal, invoking this Court's appellate jurisdiction pursuant to 28 U.S.C. §§ 158(d) and 1291. A-1565.

Case No. 13-1392 (the "Anwar Action") was brought in the United States District Court for the Southern District of New York by representatives of a putative class of investors in the Fairfield Funds. The district court had subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1332(d)(2)(A), (B). On March 8, 2013, the district court denied the Trustee's letter request to file a motion to intervene; on March 15, the district court denied the Trustee's motion to supplement the record with the Trustee's intervention papers; and on March 25, the district court approved a class settlement and entered final judgment. SPA-33. On April 8, the Trustee timely filed a Notice of Appeal,

invoking this Court's appellate jurisdiction pursuant to 28 U.S.C.
§ 1291. A-1571.

## STATEMENT OF ISSUES

1.    Whether Section 105(a) of the Bankruptcy Code authorizes
an injunction to prevent the dissipation of assets that were fraudulently
transferred from the debtor prior to bankruptcy and that are the subject
of a recovery action by the bankruptcy estate, and whether the district
court erred in denying such an injunction here.

2.    Whether SIPA preempts state law claims, and displaces
Exchange Act claims, that conflict with its statutory priority scheme
and are an impediment to its objective of recovering and returning
"customer property" to the "customers" of a failed brokerage in an
orderly and equitable fashion.

3.    Whether third-party claims (a) seeking assets that were
fraudulently transferred from the debtor prior to bankruptcy and
(b) alleging fraud in connection with such transfers are subject to the
Bankruptcy Code's automatic stay provision, 11 U.S.C. § 362(a)(1), (3).

4.    Whether laches bars the Trustee's action to enjoin a
settlement that dissipates assets fraudulently transferred from the

5

debtor until the Trustee's action to recover those same assets is complete, when (a) all parties were on notice that the Trustee would sue to prevent any attempt to collect those assets, (b) the other parties pretended to continue long-running settlement negotiations with the Trustee while striking the settlement behind the Trustee's back, and (c) the Trustee moved to stop the settlement from proceeding within weeks of learning that the settlement would impede the SIPA liquidation and have an immediate adverse impact on the estate.

5.    Whether the district court erred (a) in denying the Trustee's motion to intervene to delay a settlement that dissipates assets fraudulently transferred from the debtor, (b) in denying the Trustee's motion to supplement the record with papers stating the grounds for intervention, and (c) in approving the settlement prior to completion of the Trustee's recovery action under SIPA.

## STATEMENT OF THE CASE

These consolidated appeals involve competing claims for BLMIS customer property wrongfully transferred to the Fairfield Funds, which were among BLMIS's largest feeder funds, and those funds' principals and associated entities (collectively, the "Fairfield Defendants").  One

6

claim is by the Trustee, who seeks to recover $3.2 billion in property dissipated from BLMIS for return to its customers on an equitable, *pro rata* basis as required by SIPA (the "Recovery Action"). The other is by a class of Fairfield Funds investors (the "Anwar Plaintiffs") affected by the collapse of Madoff's Ponzi scheme (the "Anwar Action").

Because the Fairfield Defendants lack sufficient funds to satisfy both claims, the Anwar Plaintiffs' rush to settle their claims for more than $50 million threatens to frustrate the Trustee's ability to collect fully on the BLMIS estate's claim on behalf of Madoff's customers. To prevent that result, the Trustee filed an action to enjoin settlement of the Anwar Plaintiffs' claims until the Trustee's claims were resolved (the "Injunction Action") and also sought to intervene in the Anwar Action. The district court's denials of the Trustee's applications for relief are the subject of this appeal.

### A.  The Securities Investor Protection Act

Following the chaotic liquidations of numerous broker-dealers that collapsed due to fraud and mismanagement, Congress in 1970 enacted the Securities Investor Protection Act to restore confidence in the securities markets. It did this by establishing a comprehensive

remedial scheme to protect investors against the loss of their investments due to brokerage failure. In the first instance, if the assets remaining in a collapsed brokerage are insufficient to make its customers whole, they may receive advances of up to $500,000 from the Securities Investor Protection Corporation ("SIPC"), which is charged with overseeing the liquidation of failed firms. But because SIPA does not provide insurance in the manner of the FDIC, any additional recoveries must come through settlements with or litigation against the recipients of investors' assets—typically, in the case of a fraud, individuals and entities who received payments in connection with their participation in the fraud.

To carry out that end, SIPA empowers a SIPC-appointed trustee to recover "customer property" that was wrongfully transferred from the brokerage, including fraudulent transfers. 15 U.S.C. § 78fff-2(c)(3) (SPA-71). SIPA defines "customer property" broadly to include any "property of the debtor which, upon compliance with applicable laws, rules, and regulations, would have been set aside or held for the benefit of customers . . . ." § 78*lll*(4)(E) (SPA-81). And it mandates that the trustee return recovered customer property to customers on an

8

equitable, *pro rata* basis to the extent of their claims, before other creditors may collect at all. § 78fff-2(c)(1) (SPA-71).

In this way, SIPA channels all recovery actions through a single trustee, thereby achieving the "the prompt and orderly liquidation of SIPC members," while avoiding the arbitrary and unfair results of pre-SIPA litigation. *Lautenberg Found. v. Picard*, No. 11-5421, 2013 WL 616269, at *2 (2d Cir. Feb. 20, 2013) (summary order) (quoting H.R. Rep. No. 91-1613 (1970), *reprinted in* 1970 U.S.C.C.A.N. 5254, 5262).

## B.    The Madoff Fraud and the Recovery Effort

On December 11, 2008, Bernard L. Madoff was arrested and charged with securities fraud. That same day, the Securities and Exchange Commission ("SEC") filed a complaint against Madoff and BLMIS, alleging they were operating a massive Ponzi scheme. Madoff falsely told his clients that he invested their assets using several proprietary strategies. In reality, he used money from new and existing customers to fund other customers' withdrawal of principal and

supposed profit.[1]  Madoff ultimately pled guilty to securities fraud and other offenses and was sentenced to 150 years in prison.

On December 15, 2008, the SEC and SIPC jointly filed for liquidation under SIPA.  Irving H. Picard was appointed as Trustee, and proceedings were removed to Bankruptcy Court.  To complement and extend the Bankruptcy Code's automatic stay, the district court issued a series of stay orders to enjoin all direct or indirect interference with BLMIS assets so that the Trustee could marshal those assets for the benefit of BLMIS's customers and other creditors.

The task of unraveling Madoff's scheme has been unprecedented in its scope and complexity.  The final customer statements issued by BLMIS, for approximately 4,900 open customer accounts, falsely recorded nearly $64.8 billion of net investments and fictitious gains. When the music stopped, nearly $20 billion in actual investor principal (as opposed to fictitious "gains") was lost.  Over 16,000 claims would ultimately be filed on the estate.[2]

---

[1]*See generally In re Bernard L. Madoff Inv. Secs. LLC*, 654 F.3d 229, 231-33 (2d Cir. 2011).
[2]*See* The Madoff Recovery Initiative,
http://www.madofftrustee.com/claims-03.html (last visited Apr. 27, 2013).

The Trustee's customer claims process, approved by the Bankruptcy Court, governs the filing, evaluation, and resolution of these claims.  Customers share *pro rata* in distributions of recovered customer property in accordance with their net equity position.  As affirmed by this Court, this position is defined as the amount they deposited into their BLMIS account, less any amounts they withdrew.[3] As of April 2013, the Trustee has recovered or entered into agreements to recover some $9.3 billion—over half of investors' estimated losses— and over $5 billion has already been distributed to customers with allowed claims.[4]

## C.    The Trustee's Recovery Action Against the Fairfield Funds and Their Principals and Affiliates

Madoff's Ponzi scheme relied heavily on "feeder funds," outside entities which channeled investors' funds to BLMIS.  The largest were an interconnected group of funds and partnerships associated with the Fairfield Greenwich Group.  Collectively, these "Fairfield Funds" withdrew more than $3.2 billion from BLMIS during the six years prior to its liquidation filing date.

---

[3]*In re Bernard L. Madoff Inv. Secs. LLC*, 654 F.3d at 235.
[4]*See* The Madoff Recovery Initiative*, supra*.

11

On May 18, 2009, the Trustee sued several of the Fairfield Funds in Bankruptcy Court for the return of this money for *pro rata* distribution to BLMIS customers with allowed claims (the "Recovery Action").[5]   The Trustee later amended the complaint to add as defendants the remainder of the funds, as well as a group of individuals and entities who received hundreds of millions of dollars in management fees and other payments from the Fairfield Funds (the "Fairfield Defendants").  A-637–A-860.

The gravamen of the Trustee's claims is that the Fairfield Funds' withdrawals from BLMIS are avoidable fraudulent transfers because the Fairfield Defendants had actual and constructive knowledge of Madoff's fraud and were willfully blind to it.  The Trustee further sought to recover assets subsequently transferred to the Fairfield Defendants, most as management and performance "fees" based on the fictitious returns of the Fairfield Funds' investments with BLMIS.  The Trustee alleged in detail how the Fairfield Defendants misled regulators and investors, intentionally ignored evidence showing the impossibility that BLMIS's returns were legitimate, failed to perform

---

[5]*Picard v. Fairfield Sentry Ltd.*, No. 09-1239 (Bankr. S.D.N.Y. filed May 18, 2009).

due diligence on Madoff's activities, and conspired with him to deceive the SEC and perpetuate the success of his scheme.  A-644–A-645, A-729–A-782, ¶¶2-4, 338-489.

The Trustee partially resolved the estate's claims through settlements with each of the Fairfield Funds in which the Trustee avoided the initial transfers to the Fairfield Funds from BLMIS.  A-407–A-491; A630–31.  As part of these settlements, the Fairfield Funds made payments to the Trustee, assigned their claims against the Fairfield Defendants to the Trustee, and received allowed customer claims totaling some $267 million.  They have already received approximately $100 million in distributions from the Trustee.[6]  As the Bankruptcy Court observed in approving the settlements, the Fairfield Funds' investors (*e.g.*, the Anwar Plaintiffs) will be the ultimate beneficiaries of these distributions.[7]

But those settlements account for only a fraction of the $3.2 billion the Trustee seeks in the Recovery Action, because many of the

---

[6]Affidavit of Matthew Cohen in Support of Trustee's Stay Application, ¶¶3-4, 6, *Picard v. Fairfield Greenwich Ltd.*, No. 12-2047 (Bankr. S.D.N.Y. Nov. 29, 2012), ECF No. 5.

[7]Transcript of Hearing on Motion to Approve Settlement Agreement, at 37:24-38:2, *Picard v. Fairfield Sentry Ltd.*, No. 09-1239 (Bankr. S.D.N.Y. June 9, 2011), ECF No. 93; *see also* A-509–A-510.

13

fraudulently transferred assets were passed on to other persons and entities, including the Fairfield Defendants. The Trustee therefore continues to litigate claims against the Fairfield Defendants in order to recover these assets for distribution in accordance with SIPA's priority scheme.

### D.    The Anwar Action

On December 19, 2008, Pasha S. and Julia Anwar, on behalf of themselves and other Fairfield Funds investors, filed a putative class action (the "Anwar Action") in New York state court against the Fairfield Greenwich Group and eight related individuals and entities. The defendants removed the action to the Southern District in January 2009. A-973. On April 29, 2009, the Anwars and some three dozen other named plaintiffs (collectively, the "Anwar Plaintiffs") filed a first Consolidated Amended Complaint, naming substantially the same defendants as those in the Trustee's Recovery Action. They assert claims against the Fairfield Defendants under New York common law (for, *inter alia*, fraud, negligent misrepresentation, gross negligence, breach of fiduciary duty, and third-party beneficiary breach of contract) and Sections 10(b) and 20(a) of the Securities Exchange Act.

14

The Anwar Action's principal claims are premised on the same fraudulent enterprise and conduct, are directed at the same defendants, and seek to recover the same funds as the Trustee's Recovery Action. The Anwar Plaintiffs' allegations against the Fairfield Defendants mirror those in the Trustee's Recovery Action, and their account of the Defendants' wrongdoing is almost identical in structure and detail to the Trustee's.[8] In particular, they allege that the Fairfield Defendants had actual or constructive knowledge of Madoff's fraud; that they concealed Madoff's fraud from their investors; and that they "collected enormous fees . . . . on the basis of non-existent profits and asset values that were reported by Madoff." A-1072–78, ¶¶236, 238–47. Nearly all of these fees—denominated "Performance Fees," "Management Fees," and "Fees for Administrative Services and Back Office Support"—were not paid directly by the Anwar Plaintiffs but came from transfers from BLMIS. The Anwar Plaintiffs seek recovery of these fees, which they allege the Fairfield Funds subsequently transferred to the Fairfield Defendants—the same fees which the Trustee seeks to recover as

---

[8] *Compare* A-641–A-642, pp. i-ii, A-644–A-645 ¶¶2-4, A-729–A-782, ¶¶338-489, *with* A-979–A-980 pp. i-ii, A-1035–A-1071, ¶¶166-235.

15

fraudulently transferred BLMIS customer property. A-994, ¶4; A-1193, Prayer for Relief b, d.

To ensure that the Anwar Action did not prejudice the estate's recovery efforts, the Trustee regularly communicated with counsel for the Anwar Plaintiffs and the Fairfield Defendants in pursuit of a "global" settlement of both the Trustee's and the Anwar Plaintiffs' claims against the Fairfield Defendants. These discussions began in 2009 and continued off and on through the following three years. A-629, ¶3. To facilitate these talks, the Trustee consented to repeated extensions of time in the Recovery Action, beginning in summer 2009 and continuing through spring 2012. A-630, ¶5. During this period, the Trustee reached the settlement with the Fairfield Funds and conducted diligence on the Fairfield Defendants' assets. A-630–A-631, ¶7.

Throughout the negotiations, the Trustee was led to believe that the estate's interests were secure. The Fairfield Defendants repeatedly informed the Trustee that they would only enter into a global settlement which resolved both the Anwar Plaintiffs' and the Trustee's claims against them. A-630, ¶5. In December 2011, the Anwar Plaintiffs' counsel confirmed to the Trustee that they had been told that

the Fairfield Defendants' position on reaching a global settlement was unchanged. A-632, ¶10. Later that month, the Trustee hosted a meeting with the Anwar Plaintiffs' counsel regarding cooperation in their respective cases and potential global settlement negotiations with the Fairfield Defendants. A-632, ¶11. Thereafter, the Trustee was in regular communication with the Anwar Plaintiffs' and Fairfield Defendants' counsel in pursuit of a global settlement. A-632, ¶12.

At no time during years of discussion did either the Anwar Plaintiffs or Fairfield Defendants ever broach the possibility that they would pursue a settlement without the Trustee's participation. A-632–A-633, ¶14-16. Indeed, as late as October 2012, counsel for the Anwar Plaintiffs assured the Trustee that there was no non-global settlement and nothing imminent to report on the status of any settlement negotiations with the Fairfield Defendants. A-633, ¶17. That representation was false.

### E. The Anwar Settlement Dissipates the Same Assets Sought by the Trustee

Months earlier, in August 2012, the Anwar Plaintiffs and Fairfield Defendants had signed an agreement in principle to settle the dispute between them without addressing the Trustee's interest. A-633, ¶17; A-

1201–A-1202. And on November 6, 2012, the named Anwar Plaintiffs filed a motion for approval of that settlement and, after filing that motion, informed the Trustee of the settlement. A-633, ¶18.

The Anwar settlement provides an initial sum of $50 million dollars for the class, with an additional $30 million to be placed in escrow to settle certain third-party claims against the Fairfield Defendants or, barring such claims, revert to the class. *See* A-1216–A-1217. The settlement makes no direct provision for the claims brought against the same defendants by the Trustee in the Recovery Action—which claims, in any case, seek far more than the escrowed funds.

The Fairfield Defendants have stated that they possess only "very limited resources," and that the Anwar Action seeks to recover from "the same pool of limited assets" as the Trustee's Recovery Action. A-864, 3:10-19. Indeed, their counsel acknowledges that "there is absolutely no doubt the pool of assets which are being sought are far less than the dollar amount of the claims that are brought." A-865, 4:13-15. Accordingly, the settlement would necessarily drain the pool of assets available to satisfy claims brought by the Trustee in the Recovery Action.

### F.    Procedural History

#### 1.    The Trustee's Injunction Action

Upon learning of the proposed settlement, the Trustee immediately voiced objection and then, on November 29, 2012, filed the Injunction Action to prevent the Fairfield Defendants from consummating the settlement and, in particular, from transferring any assets in connection with the settlement until the completion of the Trustee's Recovery Action.  A-370; A-399, (ii).

The Trustee's stay application argued that the settlement should be prevented from proceeding on three bases: first, that the Anwar Plaintiffs' claims violated the automatic stay and related orders; second, that the Trustee was entitled to a Section 105 injunction to prevent impairment of the Bankruptcy Court's jurisdiction and injury to the estate; and, third, that an injunction was additionally required because SIPA preempted the Anwar Plaintiffs' state law claims and displaced their Exchange Act claims.  This action was withdrawn to district court and assigned to the judge presiding over the Anwar Action.  A-961.

On March 20, the district court (Marrero, J.) denied the Trustee's motion to enjoin the settlement and terminated the Injunction Action. SPA-1.   The automatic stay and related orders did not bar the

19

settlement, the court held, because the Anwar Plaintiffs' claims were "separate and distinct from those possessed by the creditors of the BLMIS estate" and sought assets that the Trustee had only alleged to be property of the BLMIS estate, without yet obtaining judgment to that effect.  SPA-8–SPA-9.

The court also held that Section 105 was unavailing because, again, the assets sought by the Trustee were not yet property of the BLMIS estate and would not be so until completion of a "successful avoidance action," SPA-16, even though the Trustee had already avoided the initial transfers.  It stated that the Anwar Plaintiffs' recovery by virtue of being first to settle did not implicate "concerns relating to the equitable distribution of customer property under SIPA or a race to the courthouse to recover preferentially to the detriment of other stakeholders . . . ."  SPA-23.  And in any case, the court observed, because the Anwar Plaintiffs were seeking only $50 million, versus the more than $9 billion so far recovered by the Trustee, "any effect on the BLMIS estate of denying the Trustee's Stay Application pales in comparison to the complete deprivation of recovery the Anwar Plaintiffs might suffer."  SPA-25, n.9.

The court held that SIPA did not preempt the Anwar Plaintiffs' state law claims and displace their Exchange Act claims because, again, their claims are "independent" ones "that the Trustee cannot bring." SPA-28.

Finally, the district court ruled that the Trustee's Injunction Action was barred by laches due to "unreasonable delay" in "wait[ing] on the sidelines for nearly four years" as the Anwar Plaintiffs and Fairfield Defendants "fil[ed] . . . more than 1,000 docket entries in the case." SPA-30. The court flatly refused to consider the assurances of the *Anwar* parties that no non-global settlement was forthcoming, reasoning that such "tactical maneuvers" had not been "brought before the Court in this action" and so could be no excuse for any delay. SPA-30. The court also refused to consider the Trustee's argument that parties who had misled the Trustee so as to exclude him from their dealing lacked clean hands and therefore could not take advantage of laches to bar the Trustee's claims.

### 2.    The Trustee Seeks To Intervene in the Anwar Action To Stay Consideration of the Settlement

To further protect the estate's interests, the Trustee also sought to intervene in the Anwar Action. In this attempted intervention, the

Trustee sought to stay consideration and approval of the settlement until the conclusion of the Recovery Action.

In accordance with Judge Marrero's individual rules, the Trustee made a request by letter for a pre-motion conference regarding the intended motion for intervention. On March 8, 2013, the judge denied the request, deemed the letter a motion to intervene, and denied it as well. SPA-33. The Trustee then requested, by letter, that the court schedule a pre-motion conference on an intended motion to supplement the record with his intervention motion, affirmative defenses, and opposition to the settlement. The court denied that request, too, refusing to file the Trustee's proposed papers. *See* SPA-38.

The court approved the Anwar settlement on March 25, 2013. SPA-40; SPA-42. The Trustee timely filed notices of appeal in both the Injunction Action and the Anwar Action on April 8, 2013. A-1565; A-1571.

## SUMMARY OF ARGUMENT

SIPA and the Bankruptcy Code exist precisely to address these circumstances, where other parties claim an entitlement to assets a SIPA trustee seeks to recover as fraudulently transferred customer

property.  At the core of those statutes is a priority ladder governing who gets paid first out of an estate's limited assets.  At the very top rung are the customers of a failed brokerage, because Congress determined that giving them special protection was both fair and necessary to maintain confidence in capital markets.  At the very bottom rung are general unsecured creditors, who are ineligible to recover unless and until customers have been made whole.  The automatic stay, as enforced and supplemented through Section 105 injunctions, guarantees that no creditors or third parties can lay claim to assets to which the creditors at the top of the ladder are entitled.

The district court disagreed with the way that Congress chose to resolve competing claims among investors injured by a brokerage's collapse.  As a result, it made three fundamental errors of law, each of which merits reversal.

*First*, the district court was wrong to hold that Section 105 is not available to enjoin a settlement that dissipates assets that were transferred from BLMIS and which the Trustee is suing to recover as fraudulent transfers.  It is undisputed that the Fairfield Defendants' assets came, at least in part, from BLMIS and that their limited pool of

23

assets is insufficient to satisfy both the settlement and the amounts sought by the Trustee.  The settlement therefore relies on assets that BLMIS transferred to its feeder funds to pay off those funds' own investors, the Anwar Plaintiffs.

Accordingly, there can be no question that the settlement causes immediate adverse economic consequences for the BLMIS estate, drawing down assets that could otherwise be used to compensate customers according to the SIPA priority scheme.  And it does this despite the fact that the Anwar Plaintiffs are on the bottom rung of the priority ladder, as general unsecured creditors of the BLMIS estate. The district court's holding that Section 105 could not block such a transfer unless and until the Trustee actually prevails in his Recovery Action eviscerates the substance of that provision, authorizes any third party to circumvent SIPA and the Bankruptcy Code simply by rushing to the courthouse, and is contrary to this Court's decisions in *Lautenberg* and *Quigley*, among others.  That view is mistaken, and should be reversed.

*Second*, the district court was wrong to hold that a SIPA liquidation may be compromised by competing claims under state law

24

and the Exchange Act. Congress intended that, following the collapse of a brokerage, SIPA would govern, even in case involving multiple entities like feeder funds. The statute empowers a single trustee to recover all property that should have been maintained on behalf of the brokerage's customers and mandates that those assets be returned to their rightful owners first, the customers, before any other parties are paid. Again, these provisions are how Congress chose to achieve its goals of protecting investors and maintaining confidence in capital markets.

For SIPA to work as Congress intended, a SIPA trustee's claims to recover transferred customer property must go first, before third parties' competing claims on those same assets. And to the extent those claims overlap because they seek the same assets, the third-party claims are preempted or displaced. The district court's holding that SIPA is no bar to third-party claims on customer property sought by a SIPA trustee is incorrect and should be reversed.

*Third*, the district court was wrong to hold that third-party claims seeking property fraudulently transferred from the debtor are not subject to the automatic stay. The Anwar Plaintiffs seek to recover

25

performance and other "fees" that they allege the Fairfield Defendants took from assets withdrawn from BLMIS, on the basis that the Fairfield Defendants had knowledge of Madoff's fraud. In substance, these claims seek to recover fraudulent transfers from BLMIS—except for the benefit of the Anwar Plaintiffs, not BLMIS customers.

The district court's holding that the automatic stay could not apply because the Anwar Plaintiffs are not BLMIS creditors is mistaken because they are actually creditors, just low-priority ones. That holding also finds no support in the law, for the reason that the stay would be completely ineffectual if any third party could compromise the estate. Similarly, the district court's holding that the stay applies only to claims that the Trustee himself has "standing" to bring only encourages creative pleading and is contrary to precedent. The district court's refusal to enforce the automatic stay consistent with its terms and this Court's decisions is grounds for reversal.

Finally, the district court's alternative holding that the Trustee's Injunction Action was barred by laches is also in error, as a matter of law and fact. Most egregiously, the court simply refused to consider the long history of settlement negotiations between all the parties, on the

26

basis that the Trustee had a duty to put the court of those negotiations. That is wrong, as a matter of law, and *per se* abuse of discretion, as was the court's dismissal of the Trustee's claim for a Section 105 injunction without any reasoning at all.

Even had the court not gotten the law wrong, any finding of laches in these circumstances would be unsupportable.  The Trustee engaged in long-running negotiations with the other parties in the hope of reaching a global settlement of all claims, and sought and received assurances that any settlement would resolve the estate's claims.  Only when the other parties struck a deal behind the Trustee's back to dissipate the Fairfield Defendants' assets was the estate's interest placed in jeopardy—at which point the Trustee immediately filed suit. There was no delay, and any "prejudice" to the other parties is due to the operation of SIPA, not timing.  The district court's holding to the contrary should be reversed.

## STANDARD OF REVIEW

In general, when reviewing a district court's denial of a preliminary injunction, this Court reviews the district court's legal holdings *de novo* and its ultimate decision for abuse of discretion.  *UBS*

27

*Fin. Servs., Inc. v. W. Va. Univ. Hosps., Inc.*, 660 F.3d 643, 648 (2d Cir. 2011).   The scope and application of the automatic stay, 11 U.S.C. § 362(a), is an issue of law subject to *de novo* review.   *United States v. Colasuonno*, 697 F.3d 164, 173 (2d Cir. 2012); *Palmdale Hills Prop., LLC v. Lehman Commercial Paper, Inc. (In re Palmdale Hills Prop., LLC)*, 654 F.3d 868, 875 (9th Cir. 2011); *Reliant Energy Servs., Inc. v. Enron Canada Corp.*, 349 F.3d 816, 825 (5th Cir. 2003).   Dismissal based on laches is reviewed *de novo*.   *Hermès Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 106-07 (2d Cir. 2000); *Ivani Contracting Corp. v. City of New York*, 103 F.3d 257, 259 (2d Cir. 1997).

Although the denial of a motion to intervene is reviewed for abuse of discretion, it is *per se* an abuse of discretion for a trial court to rely on an improper factor in its decision denying intervention.   *See DSI Assocs. LLC v. United States*, 496 F.3d 175, 182-83 (2d Cir. 2007)*; In re Application of Malev Hungarian Airlines*, 964 F.2d 97, 101 (2d Cir. 1992).   A district court's refusal to delay consideration of a settlement is generally reviewed for abuse of discretion.   *See Neilson v. Colgate-Palmolive Co.*, 199 F.3d 642, 656-57 (2d Cir. 1999); *Cnty. of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1322-23 (2d Cir. 1990).

28

However, the Court "may review the district court's decision *de novo* where an appellant's challenge to the authority of the district court to approve the settlement raises novel issues of law." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 273 (2d Cir. 2006).

## ARGUMENT

### I.    The District Court Erred in Holding That a Section 105 Injunction Was Legally Unavailable

The Fairfield Defendants never should have possessed the assets that were fraudulently transferred by BLMIS. Their wrongful possession of these assets forms the crux of the Trustee's claims to recover the transfers and the Anwar Plaintiffs' claims that the Fairfield Defendants improperly retained management fees out of the fraudulent transfers to the Fairfield Funds. The Fairfield Defendants have conceded that the Anwar Action seeks the same limited pool of assets sought by the Trustee. Because the purpose of an injunction under Section 105 of the Bankruptcy Code is to allow for "prompt and orderly liquidation of SIPC members" and to protect the SIPA estate against third-party actions that "would draw down assets" sought as fraudulent transfers, *Picard v. Lautenberg*, No. 11-5421, 2013 WL 616269, at *2 (2d Cir. Feb. 20, 2013) (summary order), the Trustee is entitled to an

29

injunction under Section 105 to preclude the settlement from depleting the assets available to compensate all victims of Madoff's fraud. A contrary result would sanction and reward the Anwar Plaintiffs' race to the courthouse.

### A.    A Section 105 Injunction Is Available To Prevent the Settlement from Impeding the Liquidation of BLMIS

Section 105 authorizes courts to issue any order "necessary or appropriate to carry out the provisions" of the Bankruptcy Code. 11 U.S.C. § 105(a) (SPA-60). Section 105 applies in SIPA liquidations, *see* 15 U.S.C. § 78fff(b) (SPA-63), and is "construed liberally to enjoin suits that might impede" the liquidation process. *MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 93 (2d Cir. 1988). That includes claims against third parties. *See, e.g.*, *id.*; *In re Quigley Co., Inc.*, 676 F.3d 45, 53 (2d Cir. 2012). This authority is consistent with a court's general equitable power to preliminarily enjoin persons who are alleged to have wrongfully obtained property from disposing of it pending a decision on the merits of a claim. *See, e.g.*, *Republic of Philippines v. Marcos*, 806 F.2d 344, 354-55 (2d Cir. 1986).

In this regard, a Section 105 injunction should issue where third-party actions against non-debtor entities "will have an immediate

adverse economic consequence for the debtor's estate." *Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282, 287 (2d Cir. 2003). Thus, in *Lautenberg*, this Court affirmed the issuance of a Section 105 injunction against litigation brought against certain close insiders of BLMIS where the insiders' assets were "claimed by the Trustee as a fraudulent transfer from BLMIS." 2013 WL 616269, at *2. The *Lautenberg* court reached its decision based on two primary considerations: (1) the injunction preserved the debtor's estate rather than encouraging "a chaotic rush to the courthouse . . . seeking assets that the trustee claims are properly part of the BLMIS estate"; and (2) the claims threatened to "draw down assets almost all of which could otherwise be expected to return to the BLMIS estate as a consequence of the Trustee's fraudulent transfer action." *Id.*

Case law from other circuits is consistent with *Lautenberg*. For example, in *Unsecured Creditors' Comm. of DeLorean Motor Co. v. DeLorean (In re DeLorean Motor Co.)*, 755 F.2d 1223, 1231 (6th Cir. 1985), the Sixth Circuit affirmed the issuance of a preliminary injunction under Section 105 that required the owners and insiders of a company that a bankruptcy estate's creditors alleged had received funds

31

fraudulently conveyed from the estate to place in escrow any proceeds from the sale of that company, pending the resolution of the status of those funds in bankruptcy proceedings. *See also O'Donnell v. Royal Bus. Group, Inc. (In re Oxford Homes, Inc.)*, 180 B.R. 1, 12-13 (Bankr. D. Me. 1995) (preliminarily enjoining under Section 105 a third-party company and its president from disposing of or encumbering $740,000 that a Chapter 11 trustee alleged had been fraudulently transferred from a debtor and was properly part of the debtor's estate).

*Lautenberg* and *DeLorean* are specific applications of the broader principle, long embraced by the courts, that Section 105 injunctions are appropriate to preserve the bankruptcy court's jurisdiction or to preserve the debtor's estate. As the Seventh Circuit explained in *Fisher v. Apostolou*:

> The jurisdiction of the bankruptcy court to stay actions in other courts extends beyond claims by and against the debtor, to include suits to which the debtor need not be a party but which may affect the amount of property in the bankrupt estate. To protect this jurisdiction, "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title," 11 U.S.C. § 105(a), including a stay.

155 F.3d 876, 882 (7th Cir. 1998) (Wood, J.) (quotation marks and citations omitted); *see also Gonzalez Hernandez v. Borgos*, 343 F.2d 802,

807 (1st Cir. 1965) (explaining that the purpose of the predecessor statute to Section 105(a) "is to give the court power to protect its custody of the estate and the administration thereof"). And as this Court has recognized, in light of the purposes of the Bankruptcy Code (not to mention SIPA), the bankruptcy court's jurisdiction is exceedingly broad, extending to matters that have "any 'conceivable effect' on the bankrupt estate." *Publicker Indus. Inc. v. United States (In re Cuyahoga Equip. Corp.)*, 980 F.2d 110, 114 (2d Cir. 1992).

*Apostolou* illustrates this broader principle. The court there found that Section 105 provided authority to enjoin third-party "claims to the same limited pool of money, in the possession of the same defendants, as a result of the same acts, performed by the same individuals, as part of the same conspiracy." 155 F.3d at 882. Despite that some of the plaintiffs may have suffered "separate and distinct injuries," they all "must wait their turn behind the trustee, who has the responsibility to recover assets for the estate on behalf of the creditors as a whole." *Id*. at 881.

That principle, as applied in *Lautenberg* and other cases, has been central to the Trustee's efforts to recover fraudulently transferred

33

assets for the benefit of all Madoff's victims.  *See, e.g., Fox v. Picard*, 848 F. Supp. 2d 469, 485-87 (S.D.N.Y. 2012); *Picard v. Maxam Absolute Return Fund, L.P.*, 460 B.R. 106, 122-123 (Bankr. S.D.N.Y. 2011), *aff'd*, 474 B.R. 76 (S.D.N.Y. 2012).

The district court's conclusion that the Trustee's claim to funds held by the Fairfield Defendants was not entitled to protection under Section 105 because the Trustee had not yet fully litigated the Recovery Action was legal error.  Given the body of law in opposition to this holding, it is telling that the district court failed to cite any pertinent case law in support of its reasoning.  Instead, the court cited *Picard v. Merkin*, 440 B.R. 243, 271 (Bankr. S.D.N.Y. 2010), which did not involve an injunction at all, but turnover—a different form of relief available in more limited circumstances.  *See* 11 U.S.C. § 542(a).[9]  Moreover, this "actual success" standard for a Section 105 injunction goes far beyond

---

[9]The bankruptcy court's decision in *Merkin* held only that a trustee cannot recover transfers before they are avoided.  Significantly, subsequent to *Merkin*, the bankruptcy court enforced the automatic stay and issued or enforced injunctions prior to a full litigation of avoidance claims.  *E.g.*, *Picard v. Stahl*, 443 B.R. 295 (Bankr. S.D.N.Y. 2011).

34

the improper "likelihood of success on the merits" standard that the district court purported to apply.[10]

If upheld, the district court's decision would deprive Section 105 of its equitable force, while creating a split with the Sixth Circuit and Seventh Circuit.  Under the district court's holding, Section 105 can never be effective to protect assets to which the estate has a colorable legal claim and that are the subject of pending recovery litigation from imminent and permanent dissipation.  That conclusion cannot be reconciled with Congress's expansive grant of jurisdiction to protect the reorganization and liquidation processes.

## B.   A Section 105 Injunction Is Appropriate Here

The considerations that swayed the *Lautenberg* Court likewise favor an injunction of the *Anwar* settlement.  To begin with, there is no question that this action will dissipate assets that the Trustee has claimed are part of the BLMIS estate.  The Fairfield Defendants

---

[10]The standard of Fed. R. Civ. P. 65 does not apply to a Section 105 injunction, which is authorized by statute and akin to an All-Writs Act injunction.  *See, e.g., In re Adelphia Commc'ns Corp.*, 298 B.R. 49, 54 (S.D.N.Y. 2003); *LTV Steel Co., Inc. v. Bd. of Educ. (In re Chateaugay Corp.)*, 93 B.R. 26, 29 (S.D.N.Y. 1988); *Garrity v. Leffler (In re Neuman)*, 71 B.R. 567, 571-72 (S.D.N.Y. 1987).  Tellingly, this Court's decision in *Lautenberg* did not apply that standard.  2013 WL 616269, at *2.

admitted that they possess only "very limited resources," and that the Anwar Action seeks to recover from "the same pool of limited assets" as the Trustee's Recovery Action.  A-864, 3:9, 3:18; *see also* A-865, 4:13-15. Under *Lautenberg* and *DeLorean*, that fact alone supports an injunction as to property subject to a pending recovery action by the Trustee.  The district court improperly dismissed this concern because it considered the tens of millions of dollars at stake to be *de minimis* to the Trustee's overall recovery efforts.  SPA-25, n.9.

Beyond that, the settlement should be enjoined because it is a rush to the courthouse by creditors seeking assets that are properly part of the BLMIS estate, just as in *Apostolou*.  The district court incorrectly held that the Anwar Plaintiffs' claims were wholly independent and that they are not estate creditors and thus cannot be enjoined.  Neither point is correct.

The Anwar Plaintiffs are creditors of the BLMIS estate because their alleged injuries are a result of and intertwined with Madoff's fraud.  The very same conduct that they allege in the Anwar Action states claims on the BLMIS estate, for the very same losses, under various causes of action.  *See, e.g.,* 18 U.S.C. § 1964(c); § 1961(1) (listing

36

mail and wire fraud, *inter alia*, as predicate offenses).  *Cf. In re Bullion Reserve of N. Am.*, 836 F.2d 1214, 1218 (9th Cir. 1988) (under "the Bankruptcy Code's broad definitions" of "creditor" and "claim," a person becomes a "creditor" the moment he accrues a right to payment).[11]

The district court's assertion that investors denied customer status because they did not invest directly with BLMIS "are not creditors of the BLMIS estate," SPA-9, is therefore incorrect; although unlikely to collect anything directly, they are still general unsecured creditors.  *See Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 454 B.R. 285 (Bankr. S.D.N.Y. 2011).  That there is no likelihood of ultimate recovery on such non-customer claims due to SIPA's priority scheme and the estate's limited assets does not somehow deprive Section 105 of its force to protect the BLMIS estate against creditors' jockeying for preference.  It simply reflects that, among BLMIS's many creditors, these claims' priority is the lowest.

In addition, the Anwar Plaintiffs, as investors in the Fairfield Funds, are the ultimate beneficiaries of the Fairfield Funds' allowed

---

[11] Of course, as a prerequisite to allowance and possible satisfaction, any claim by a creditor must be submitted in accordance with the procedural requirements of SIPA and the Bankruptcy Code.  *See, e.g.*, 15 U.S.C §§ 78fff-2(a)(2), 78fff-2(a)(3) (SPA-69–SPA-70).

claims on the BLMIS estate. Indeed, they concede that their lawsuit and its settlement are motivated by their dissatisfaction with their recovery through the SIPA proceeding. *See* A-509–A-510.

The Anwar Plaintiffs seek some of the same assets as the Trustee. With exceptions relating only to minor placement fees, the Anwar Plaintiffs' claims allege that the Fairfield Defendants acted unlawfully by retaining management and performance fees based on the fictitious profits garnered from the Fairfield Funds' investments with BLMIS— not from payments made by the Anwar Plaintiffs. *See* A-1072–A-1074, A-1077, ¶¶236-39, 240, 245. These "fees" are (according to their own pleadings) proceeds of the same fraudulent transfers from BLMIS that the Trustee seeks to recover. Because their entitlement to these assets is not superior to the Trustee's, the Anwar Plaintiffs' sole claim to them is that they were first—*i.e.*, that they beat every other creditor in the race to the courthouse. In this instance, an injunction is necessary to preserve the estate and the bankruptcy court's jurisdiction over these assets.

## II.    The Settlement Is Inconsistent with SIPA

The text and history of SIPA demonstrate that Congress intended it to control the recovery and distribution of assets following the collapse of a broker-dealer.  Congress knew, in particular, that the unraveling of fraudulent investment schemes inevitably leads to a scrum of competing claims, to the ultimate detriment of investors and confidence in the securities market.  Congress therefore sought to channel all legal proceedings through a single trustee who would recover missing assets and return them, on a fair and equitable basis, to the class of investors whom it deemed in need of special protection, broker-dealer "customers."  Third-party lawsuits that divert assets from the SIPA proceeding are necessarily and fundamentally incompatible with the comprehensive remedial scheme that Congress legislated. Because the settlement would do precisely that to satisfy claims under state law and the Exchange Act, it cannot proceed at this time.

### A.    Congress Intended SIPA To Displace Laws That Would Conflict with the "Prompt and Orderly" Liquidation of Failed Brokerages for Their Customers' Benefit

SIPA's specific provisions regarding the recovery and distribution of "customer property" would be deprived of their force and effect if, in

39

any fraud that involved third parties like feeder funds, assets that had been transferred to those third parties were not fully subject to SIPA. In that case, the failed brokerage's "customers" would recover from only the limited assets held by the estate, while claimants on the third parties—who possess derivative claims—could jump to the head of the line in recovery if they were fast to file or settle lawsuits. The best that could be said of this "musical chairs" view of the law is that, in some cases, the SIPA trustee (and thereby the brokerage's own "customers") might win the race to the courthouse and, through that fluke of luck, actually manage to carry out the terms of the SIPA statutory scheme. But in other cases, the trustee would not, and some other party— whether a "customer" or not—would prevail. This kind of arbitrary and inequitable result is precisely what Congress sought to preempt by enacting a comprehensive and specific liquidation process in SIPA.

Congress knew that its purposes could be achieved only by means of a comprehensive mechanism to protect the customers of failed brokerages. The SEC report that prompted SIPA's enactment bemoaned "the difficulty of developing a system which assures a fair result to all claimants against the assets of a broker-dealer" and

40

therefore recommended that "the Bankruptcy Act should be amended to empower the Commission to petition that an insolvent broker-dealer be adjudicated a bankrupt, so as to assure equitable treatment of claimants." Report of Special Study of Securities Markets of the SEC, H.R. Doc. No. 88-95, pt. 1, at 414-16 (1963). To that end, SIPA built on bankruptcy law—which already "provides a comprehensive federal system of penalties and protections to govern the orderly conduct of debtors' affairs and creditors' rights," *E. Equip. & Servs. Corp. v. Factory Point Nat'l Bank, Bennington*, 236 F.3d 117, 120 (2d Cir. 2001)—by establishing a special priority scheme for the benefit of certain statutorily-defined "customers" and empowering a trustee to investigate transfers of "customer property" from the brokerage, recover wrongfully transferred customer property, and distribute the proceeds in accordance with the priority scheme. 15 U.S.C. §§ 78fff-1(d), 78fff-2(c)(1), (3) (SPA-67; SPA-71).

Congress was not blind to the fact that persons who had wrongfully acquired customer property prior to the failure of a brokerage could be subject to competing claims, not least for securities fraud. Congress knew that fraud, conversion and other unlawful

41

conduct might cause a broker-dealer's failure. *See, e.g.*, H.R. Rep. No. 95-746, at 21 (1977) (discussing "stolen" securities). For that reason, SIPA's expansive definition of "customer property" encompasses "property transferred by the debtor, including property *unlawfully converted*." 15 U.S.C. § 78*lll*(4) (emphasis added) (SPA-80).

Congress also knew well, and specifically sought to address, the dangers posed by piecemeal litigation over failed brokerages in cases involving fraud. A primary impetus for SIPA was the "Salad Oil Swindle" of 1963, which led to the failure of the broker Ira Haupt & Co. and a proliferation of lawsuits that proved an obstacle to attempts to equitably satisfy its customers' claims. *See* 1970 U.S.C.C.A.N. at 5256-57; *Mittendorf v. J. R. Williston & Beane Inc.*, 372 F. Supp. 821, 831 n.5 (S.D.N.Y. 1974) ("[T]he collapse of Ira Haupt & Co. and the subsequent deluge of customer claims litigation . . . was in part responsible for the enactment of the Securities Investor Protection Act . . . ."); Securities Investor Protection: Hearings Before the Subcomm. on Commerce & Fin. of the H. Comm. on Interstate & Foreign Comm., 91st Cong. 91-67, at 1 (1970) (statement of Rep. John E. Moss, Chairman). The bankruptcy trustee in that case recognized that "it was impossible to

42

compartmentalize [his] investigation" to particular claims or claimants, *In re Ira Haupt & Co.*, 361 F.2d 164, 168 n.6 (2d Cir. 1966) (quotation marks omitted), and the courts charged with sorting out the competing claims acknowledged the "magnitude and difficulty" of the trustee's task. *In re Ira Haupt & Co.*, 287 F. Supp. 318, 320 (S.D.N.Y. 1968). The result was a multiplication of litigation, with often-inequitable results. *Cf.* 116 Cong. Rec. 39,352 (1970) (remarks of Rep. Boland) ("When brokerage houses fail . . . the small investor is the principal victim. A veritable labyrinth of litigation awaits him should he seek redress in the courts.").

It was precisely to prevent another morass of competing claims following the failure of a brokerage that Congress enacted SIPA to establish a comprehensive liquidation process that would "as promptly as possible . . . distribute customer property and . . . satisfy net equity claims of customers," 15 U.S.C. § 78fff(a)(1)(B) (SPA-63), in a fair and equitable fashion. The whole point was to displace the operation of otherwise applicable laws that impeded achievement of that result.

43

**B.    The Settlement Resolves the Plaintiffs' State Law Claims in a Manner That Conflicts with Federal Law**

"[T]he laws of the United States . . . shall be the supreme law of the land . . . , anything in the constitution or laws of any state to the contrary notwithstanding."    U.S. Const. art. VI, cl. 2.    Even when Congress has not expressly preempted state law or occupied the field, "state law is nevertheless pre-empted [1] to the extent it actually conflicts with federal law, that is, when compliance with both state and federal law is impossible, or [2] when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *California v. ARC Am. Corp.*, 490 U.S. 93, 100-01 (1989) (quotation marks and citations omitted).    The settlement's resolution of state law claims fails both tests.

First, the settlement of the Anwar Plaintiffs' state law claims is preempted to the extent it prevents compliance with the requirements of federal law regarding the recovery and distribution of "customer property," as defined in SIPA.  *See ARC Am.*, 490 U.S. at 100-01.  SIPA defines "customer property" to include "property unlawfully converted" and "any other property of the debtor which, upon compliance with applicable laws, rules, and regulations, would have been set aside or

44

held for the benefit of customers . . . ."  15 U.S.C. § 78*lll*(4)(E) (SPA-81).
It specifically authorizes the Trustee to avoid and recover wrongful
transfers of customer property from the debtor, 15 U.S.C. §§ 78fff-1(a),
78fff-2(c)(3) (SPA-66; SPA-71), and mandates that "[s]uch recovered
property shall be treated as customer property," § 78fff-2(c)(3) (SPA-71),
and therefore distributed on a *pro rata* basis and in accordance with
SIPA's priority scheme.  § 78fff-2(c)(1) (SPA-71).

Carrying out these provisions, the Trustee brought an action
against the Fairfield Defendants to recover customer property that was
wrongfully transferred to them.  Should the Trustee prevail in that
action, federal law entitles the BLMIS estate to recover such property,
and it is the Fairfield Defendants' commensurate obligation under
federal law to return it.  It is also the Trustee's obligation, upon
recovery of such property, to distribute it in accordance with SIPA's
priority scheme.  § 78fff-2(c)(1)(B), (d) (SPA-71–SPA-72).  This is how
SIPA treats property that should have been set aside or held for the
benefit of customers but was instead wrongfully transferred to third
parties; under SIPA, those parties have no legitimate claim to such
property and certainly no right to dissipate it.

45

The settlement clashes with those federal obligations by relying on state law to deny the Trustee possession of property that federal law entitles him to collect and circumventing the priority scheme that federal law mandates. And it would do this, while the Trustee's Recovery Action is pending, to resolve state law claims that are premised on the operation of the same fraudulent enterprise that is the subject of the SIPA liquidation proceedings, seek the same proceeds of that enterprise, and are for the preferential benefit of persons who already stand to benefit from the Fairfield Funds' customer claims on the BLMIS estate. Because compliance with both federal law and the settlement's execution of state law is not possible unless and until the Trustee's claims against the Fairfield Defendants in the Recovery Action are resolved, the settlement may not be carried out at this time.

Second, the settlement is preempted to the extent it interferes with the Trustee's ability to recover customer property because it is plainly "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *ARC Am.*, 490 U.S. at 101 (quotation marks omitted). Congress's avowed purpose was to end the pre-SIPA litigation free-for-all, which resulted in arbitrary and unfair

46

recoveries and undermined investor confidence in securities markets, by establishing a comprehensive and orderly liquidation process that would rapidly recover and return property to the customers of failed brokerages.  15 U.S.C. § 78fff(a) (SPA-63); *see also* 1970 U.S.C.C.A.N. at 5255 (describing purpose of and need for SIPA).  Congress intended that this process would be used to simplify the resolution of massive fraud cases involving numerous parties in complex arrangements, like the collapse of Ira Haupt & Co., by putting a single trustee at the helm of the recovery process and placing certain "customers" at the front of the line for distributions.

The Anwar Plaintiffs, apparently dissatisfied with Congress's decision to afford BLMIS customers a higher priority than their own, brought their own claims under state law demanding property that would otherwise be expected to return to the BLMIS estate.  The Fairfield Defendants, facing liability that exceeds their assets, may well prefer to pay off their own former investors rather than return assets to the BLMIS estate for the benefit of all Madoff's victims.  But that is precisely the situation that Congress sought to avoid: multiple recovery proceedings and arbitrary distributions.  The Anwar Plaintiffs' race to

47

the courthouse and to settlement cannot be allowed to defeat the requirements of federal law in SIPA.

## C.    The Settlement Resolves the Plaintiffs' Exchange Act Claims in a Manner That Conflicts with SIPA

The settlement's resolution of the Anwar Plaintiffs' Exchange Act claims also conflicts with the requirements of SIPA, such that those claims are displaced in these circumstances or must be harmonized with SIPA by delaying their adjudication.

As described above, Congress knew that those who had wrongfully acquired customer property could be subject to competing claims, including for securities fraud.   Nonetheless, it empowered the SIPA trustee to attempt to recover all "customer property" wrongfully transferred from a failed brokerage, 15 U.S.C. § 78fff-2(c)(3) (SPA-71), and required that all such proceeds be distributed according to a specific priority scheme, § 78fff-2(c)(1) (SPA-71).

In contrast to those express provisions, Section 10(b) (which provides the basis for all of the Anwar Plaintiffs' federal claims) is "a right of action Congress did not authorize when it first enacted the statute and did not expand when it revisited the law." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 167 (2008).    It

48

therefore must be given "narrow dimensions," particularly when Congress has identified conflicting policy considerations, *e.g.*, *id.* at 162-63 (consulting PSLRA to interpret Section 10(b)'s scope of liability) or when there is a risk of bad "practical consequences." *Id.* at 163-64; *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 188-89 (1994).

Here, the Anwar Plaintiffs' claims seek assets that BLMIS transferred to the Fairfield Defendants and which were denominated as "fees" based on fictitious "profits," on the basis that these transfers were part of a scheme to defraud investors. Those same allegations provide the basis for the Trustee's action to recover the same assets under SIPA.

In circumstances where two federal statutes conflict, the governing statute is the one that represents "Congress' detailed judgment" of what should happen in those circumstances. *United States v. Estate of Romani*, 523 U.S. 517, 532 (1998). On that basis, the Supreme Court in *Romani* rejected the government's claim, under the general priority statute, 31 U.S.C. § 3713(a), that its unrecorded lien on an insolvent estate entitled it to priority over secured creditors.

49

Instead, the Court concluded, the Tax Lien Act of 1966 governs because it "is the later statute, the more specific statute, and its provisions are comprehensive, reflecting an obvious attempt to accommodate the strong policy objections to the enforcement of secret liens," as would be authorized under the general priority statute. *Id*.

*Romani* is precisely on point, and SIPA is the more recent, more specific, and more comprehensive statutory provision. As described above, Congress contemplated that SIPA would control in precisely this situation, where multiple parties are involved in a single fraudulent enterprise and competing claims threaten to dissipate recoverable customer property and divert it from SIPA's priority scheme. Section 10(b), the more general provision, does not address how to resolve the competing claims that inevitably arise following the collapse of brokerage due to fraud. Indeed, SIPA was enacted specifically to address the "strong policy objections" to the litigation free-for-all, under Section 10(b) and other causes of action, that prevailed prior to its enactment. In these circumstances, the Exchange Act cannot trump SIPA on the sole basis that the Anwar Plaintiffs are first in time to settle.

But a conflict is not inevitable.  Delaying resolution of the Anwar Plaintiffs' Exchange Act claims until the Trustee's Recovery Action is complete and SIPA's requirements have therefore been met would avoid the possibility of any conflict.  In this way, the Court may "give effect to each . . . while preserving their sense and purpose."  *Watt v. Alaska*, 451 U.S. 259, 267 (1981).

### D.    SIPA Requires an Injunction or Stay of the Settlement

The Trustee does not seek to preclude any possible recovery by the Anwar Plaintiffs, only to ensure that the Anwar Plaintiffs' claims are not resolved in a manner that conflicts with the Trustee's superior entitlement under SIPA.  In these circumstances, SIPA's primacy may be enforced through either a preliminary injunction or a stay of the settlement.

The district court's denial of the Trustee's motion for a preliminary injunction was therefore in error.  In addition to the grounds stated above, *see supra* § I, injunctive relief is necessary to carry out the requirements of the liquidation process mandated by Congress in SIPA, in the face of conflicting claims under state law and the Exchange Act.  *See In re Dairy Mart Convenience Stores, Inc.*, 411

F.3d 367, 376-77 (2d Cir. 2005) (upholding injunction necessary to enforce federal bankruptcy law against conflicting state regulations). The district court's holding to the contrary was legal error.

Also in error were the district court's denial of the Trustee's motion to intervene and approval of the settlement at this time. Because the settlement resolves state law and Exchange Act claims in a manner that conflicts with SIPA, the district court should have stayed its consideration of the settlement until the Trustee's Recovery Action was complete and the application of SIPA thereby resolved. *See Texaco Puerto Rico, Inc. v. Dep't of Consumer Affairs*, 60 F.3d 867, 873 (1st Cir. 1995) (stay pending ruling on preemption). What it should not have done was to approve a settlement that was contrary to federal law. *Cohen v. Viray*, 622 F.3d 188, 196 (2d Cir. 2010) (vacating settlement as contrary to law); *Robertson v. Nat'l Basketball Ass'n*, 556 F.2d 682, 686 (2d Cir. 1977). Its refusal to even consider SIPA's application to the settlement of claims so intertwined with the BLMIS estate's interests was abuse of discretion.

The Trustee was entitled to intervene to raise this point and protect the otherwise-unrepresented interest of the BLMIS estate in the

52

property and transactions at issue in the Anwar Action. The district court rejected the Trustee's motion to intervene without actually allowing the Trustee to file a motion, instead speculating (based on a two-page letter requesting a conference regarding the anticipated motion, as required by the judge's individual rules) what the Trustee would argue and then rejecting those speculated arguments in a short summary order. This was, itself, a violation of the Trustee's right to seek to intervene under Fed. R. Civ. P. 24 and exceeded the district court's authority under Fed. R. Civ. P. 83(b) by imposing a severe "sanction or other disadvantage" based on a judge's own practices. The court's reliance on an improper factor—whether the Trustee could raise related arguments in a separate proceeding—likewise exceeded its authority. *Compare with* Fed. R. Civ. P. 24(a)(2), (b)(1)(B) (listing factors).

Contrary to the district court's assertion, the Trustee's motion was timely, given that (1) the other parties were on notice of the Trustee's objection to the settlement; (2) the Anwar Plaintiffs have no legitimate interest in assets properly subject to recovery by the Trustee under SIPA; (3) adequate time remained to brief and rule on the motion; and

53

(4) any delay by the Trustee was due to the other parties' concealing the possibility of a settlement that did not include the Trustee until November.    Finally, given the undisputed history of negotiation between the parties, the district court's exclusive focus on the time that had elapsed since the filing of the litigation was itself an abuse of discretion.  *See Stupak-Thrall v. Glickman*, 226 F.3d 467, 475 (6th Cir. 2000) ("The absolute measure of time between the filing of the complaint and the motion to intervene is one of the least important . . . circumstances.").

In sum, SIPA requires enjoining the settlement's resolution of the Anwar Plaintiffs' claims, or staying approval of the settlement, until such time as the Trustee's Recovery Action is complete.

## III.  The Settlement Violates the Automatic Stay

The automatic stay "should not be undermined by artful pleading that depends on form rather than substance."  *In re Commonwealth Oil Ref. Co., Inc.*, 805 F.2d 1175, 1187 (5th Cir. 1986) (quotation marks omitted).    While purporting to have suffered wholly "independent" injuries different from those of Madoff's other victims, certain of the Anwar Plaintiffs' claims seek to recover assets that they allege were

transferred from BLMIS to the Fairfield Defendants, on the basis that the Fairfield Defendants had actual or constructive knowledge of Madoff's fraud. The substance of these claims, if not their form, is fraudulent conveyance, which this Court has held to be the paradigmatic example of a true "claim against the debtor" that is subject to the automatic stay under 11 U.S.C. § 362(a)(1). *See FDIC v. Hirsch (In re Colonial Realty Co.)*, 980 F.2d 125, 131-32 (2d Cir. 1992). The settlement, which makes no distinction between these and other claims, therefore violates the stay.

This Court held in *Colonial Realty* that "a third-party action to recover fraudulently transferred property is properly regarded as undertaken 'to recover a claim against the debtor' and subject to the automatic stay" under Bankruptcy Code Section 362(a)(1). *Id*. That is because, "'[a]bsent a claim against the debtor, there is no independent basis for the action against the transferee.'" *Id*. at 132 (quoting *In re Saunders*, 101 B.R. 303, 305 (N.D. Fla. 1989)). In fact, the legislative history of Section 362(a)(1) indicates that it was intended precisely "to prevent the issuance of a writ of execution by a judgment creditor of the debtor to obtain property that was property of the debtor before the case

but that was transferred." *Id.* (quoting H.R. Rep. No. 95-595, *reprinted in* 1978 U.S.C.C.A.N. 5787, 6297). *See also Saunders*, 101 B.R. at 305 (applying automatic stay to third-party action).

On that reasoning, *Colonial Realty* affirmed the injunction of an action by the FDIC, as receiver for a group of failed banks, seeking to recover millions that an executive of those banks' leading borrower, by then in bankruptcy, had transferred to his wife. *Id.* at 127-28. Although those funds were not yet "property of the estate" within the meaning of 11 U.S.C. § 362(a)(3) (SPA-62), the action against the wife was an "action . . . to recover a claim against the debtor" and therefore subject to the automatic stay. *Id.* at 132.

Certain of the Anwar Plaintiffs' claims here are, in substance, indistinguishable from those in *Colonial Realty*. Whether sounding in New York common law or under the federal Exchange Act, these claims (per the Anwar Plaintiffs' allegations) seek to recover "fees" that the Fairfield Defendants took from assets withdrawn from BLMIS, on the basis that the Fairfield Defendants had actual or constructive knowledge of Madoff's fraud. That is, of course, the same basis as the avoidance action brought by the Trustee on behalf of all BLMIS

56

creditors.  These are, in essence, fraudulent transfer claims, creatively pleaded, and duplicate the Trustee's own claims.  As such, they are subject to the stay.

For the same reasons, these claims are, at the absolute least, "intertwined" with the BLMIS estate's fraudulent transfer claims, which are unquestionably "property of the estate" subject to the automatic stay under 11 U.S.C. § 362(a)(3) (SPA-62).  *See 48th St. Steakhouse, Inc. v. Rockefeller Grp., Inc. (In re 48th St. Steakhouse, Inc.)*, 835 F.2d 427, 431 (2d Cir. 1987).  Accordingly, the Anwar Plaintiffs' claims are equally subject to the stay.  *Id*.

The district court's assertion that the Anwar Plaintiffs are not creditors of BLMIS and therefore not subject to the automatic stay is incorrect.  First, the automatic stay is not limited to claims by creditors, and would be entirely ineffectual if it were so limited.  By its terms, it bars any action "to recover a claim against the debtor" or "to obtain possession of property of the estate or . . . to exercise control over property of the estate," irrespective of whether such attempts are undertaken by creditors.  11 U.S.C. § 362(a)(1), (3) (SPA-62).  The point is not just to block creditors from obtaining undue preferences, but "to

57

prevent dissipation of the debtor's assets before orderly distribution to creditors can be effected."  *SEC v. Brennan*, 230 F.3d 65, 70 (2d Cir. 2000) (quotation marks omitted).  Second, as described in § I.B *supra*, the Anwar Plaintiffs *are* low-priority creditors of BLMIS, as well as the beneficiaries of the Fairfield Funds' customer claims.   In these circumstances, application of the automatic stay is therefore also essential "'to prevent creditors from stealing a march on each other.'"  *Sosne v. Reinert & Duree, P.C. (In re Just Brakes Corporate Sys., Inc.)*, 108 F.3d 881, 884 (8th Cir. 1997) (quoting *Brown v. Armstrong*, 949 F.2d 1007, 1010 (8th Cir. 1991)).

Finally, the district court's holding that the automatic stay was inapplicable because the Trustee lacked "standing" to bring the Anwar Plaintiffs' precise claims, as pleaded, is contrary to precedent.   In *Colonial Realty*, it was undisputed that the claim at issue "belongs exclusively to the FDIC as receiver."  980 F.2d at 130.  But that was irrelevant because "the FDIC is clearly seeking to recover a claim against [the debtor]."  *Id.* at 132.  Whether the Trustee could or could not bring the precise claims asserted by the Anwar Plaintiffs has no

bearing on application of the automatic stay. *See also Fox*, 848 F. Supp. 2d at 480-81.

## IV.  The Trustee's Injunction Action Is Not Barred by Laches

Laches is "designed to promote justice by preventing surprises," *In re Becker*, 407 F.3d 89, 97 (2d Cir. 2005) (quoting *Rothensies v. Elec. Storage Battery Co.*, 329 U.S. 296, 301 (1946)), and not, as here, as an offensive weapon to defeat claims that all parties knew were inevitable. The Trustee told the Anwar Plaintiffs and Fairfield Defendants repeatedly, from early on, that he would block any attempt to collect fraudulently transferred assets held by the Fairfield Defendants. The Trustee engaged in negotiations with the other parties over the course of the litigation, in the hope of reaching a global settlement, and sought and received assurances that any settlement would resolve the estate's claims. Only when the other parties struck a deal behind the Trustee's back to dissipate the Fairfield Defendants' assets was the estate's interest placed in jeopardy—at which point the Trustee immediately filed suit. In these circumstances, the other parties could only have been surprised if the Trustee *had not acted to protect the estate's interest* by seeking an injunction.

59

The district court misconstrued and misapplied the law governing laches, flatly refusing to consider these circumstances.  It dismissed all of the Trustee's claims without even evaluating the application of laches to the Trustee's claim for relief under Section 105, which differs from the automatic stay in terms of both timing and potential prejudice.  It ignored the Anwar Plaintiffs' unclean hands, which are an absolute bar to application of laches.  It misconstrued the nature of the relief sought by the Trustee, in order to emphasize the prejudice to the Anwar Plaintiffs.  And it ignored that the "automatic stay" is, in fact, automatic, such that its enforcement cannot be barred by laches.

Because the Anwar Plaintiffs and Fairfield Defendants plainly failed to carry their burden to demonstrate (1) that the Trustee unreasonably delayed in bringing suit and (2) that such delay caused them substantial prejudice, *Veltri v. Bldg. Serv. 32B-J Pension Fund*, 393 F.3d 318, 326 (2d Cir. 2004), the district court could have no basis to find that laches barred the Trustee's Injunction Action.

**A.    The District Court's Application of Laches to the Trustee's Section 105 Claim Was *Per Se* Abuse of Discretion**

As an initial matter, the district court abused its discretion by holding, without any analysis, that the Trustee's claim for relief under Section 105 barred by laches. SPA-30 (finding delay and prejudice regarding application of automatic stay alone). The district court's laches analysis assumed that the Trustee sought only to have the Anwar Plaintiffs' claims declared void *ab initio* and permanently enjoined based on application of the automatic stay. SPA-30.

But the Trustee's claim for injunctive relief differs from typical application of the automatic stay in two crucial respects. First, relevant to delay, equitable relief under Section 105 is not automatic, but becomes available when there is a ripened threat to the estate's interests or the bankruptcy court's jurisdiction. *Lautenberg*, 2013 WL 616269, at *2 (injunction appropriate to prevent "immediate" adverse consequences). Second, relevant to prejudice, the Trustee expressly sought to enjoin the settlement not for all time, but only on a preliminary basis until resolution of the Recovery Action. The district court's application of laches to dismiss the Trustee's claim for relief

61

under Section 105 without even addressing that claim is *per se* abuse of discretion. *See Sykes v. Anderson*, 625 F.3d 294, 323 (6th Cir. 2010); *United States v. Dwyer*, 539 F.2d 924, 928 (2d Cir. 1976).

Its ruling was, in any case, unsupportable, because neither delay nor substantial prejudice is present. There was no delay because the Trustee brought suit the moment he learned that Appellees, contrary to their repeated assurances, struck a deal behind his back. "Although a plaintiff cannot simply sleep on his rights, he has no obligation to sue until . . . his right to protection [has] clearly ripened." *ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic*, 314 F.3d 62, 68 (2d Cir. 2002) (quotation marks omitted).

Any delay would cause, at most, only minor prejudice to the other parties because the Trustee seeks a preliminary injunction, pending completion of the Recovery Action. If the Trustee's Recovery Action is ultimately found to be without merit, as the other parties generally contend, the Anwar Plaintiffs will suffer only a brief and inevitable delay in recovery—perhaps less of a delay than if the Trustee had sought to enjoin their action on day one. The same is true if, as the Anwar Plaintiffs maintain, the Fairfield Defendants have sufficient

assets to satisfy both the settlement and the Trustee's claims.[12]  Finally, if the Fairfield Defendants' assets do fall short, that is a result of the operation of SIPA, not the Trustee's timing, and so is not relevant to application of laches.  *See supra* § II.  *See also United States v. Oddo*, 314 F.2d 115, 119 (2d Cir. 1963) ("To make operative the defense of laches, the lapse of time must bring with it actual and demonstrable prejudice.").

## B.    The District Court Ignored the Anwar Plaintiffs' Unclean Hands

The district court refused to address the Anwar Plaintiffs' unclean hands, which bar application of laches.  As late as October 2012, the Anwar Plaintiffs assured the Trustee that the estate's interests were protected and that no non-global settlement was in the cards, despite the fact that the Anwar Plaintiffs and Fairfield Defendants had two months earlier agreed in principle to cut the Trustee out of their settlement.  A-633, ¶17; A-1201–A-1202.  "If the party which advances the defense of laches is responsible for the delay or contributes substantially to it he cannot take advantage of it."  *Potash Co. of Am. v.*

---

[12]*See* Endorsed Letter to Judge Marrero from David A. Barrett, at 3, *Anwar v. Fairfield Greenwich Ltd.*, No. 09-118 (S.D.N.Y. Feb. 28, 2013), ECF No. 1060.

*Int'l Minerals & Chem. Corp.*, 213 F.2d 153 (10th Cir. 1954). Because the Anwar Plaintiffs do not "come with clean hands," they fail to satisfy "a dispositive, threshold inquiry" to laches. *Hermès Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 107 (2d Cir. 2000) (quotation marks omitted).

### C.    Notice and Negotiation Bar Laches

The district court simply refused to consider evidence of notice, negotiations, and assurances because it felt that these matters should have been brought to the court's attention earlier in the litigation. SPA-30, n.10. But the law is clear that it is notice to the parties, not the court, that defeats laches. *Veltri*, 393 F.3d at 326-27. In turn, "[a] court must . . . consider and weigh any justification offered by the plaintiff for its delay." *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1033 (Fed. Cir. 1992) (en banc). The district court's refusal to do so is *per se* abuse of discretion. *See In re Application of Malev Hungarian Airlines*, 964 F.2d 97, 101 (2d Cir. 1992).

In any case, laches cannot lie here because the other parties were on notice of the Trustee's intentions. Laches is not available where a defendant "cannot claim to have been unfairly surprised by, nor can it

claim to have been unable to plan to account for, a dispute of which it was promptly informed." *Veltri*, 393 F.3d at 326-27. On that basis, the Second Circuit reversed a district court's decision that a retiree's lawsuit against a pension fund, filed some eleven years after he first objected to his monthly payment, was barred by laches. *Id.* It was enough, the court explained, that the retiree "in fact informed the Fund of his concern within months of the initial determination." *Id.* at 326. *See also NML Capital v. Republic of Argentina*, 699 F.3d 246, 261 (2d Cir. 2012) (rejecting laches defense where nation was on notice, five years before suit, that bondholders might sue); *Hutton Constr. Co., Inc., v. Cnty. of Rockland*, 52 F.3d 1191, 1193 (2d Cir. 1995) (rejecting laches defense where defendants had "notice the Sureties might assert their rights"); *EEOC v. Local 638*, 753 F.2d 1172, 1179 (2d Cir. 1985), *aff'd, Local 28 v. EEOC*, 478 U.S. 421 (1986) (rejecting laches defense where "Defendants had ample notice that plaintiffs were dissatisfied"). Here, the Anwar Plaintiffs and Fairfield Defendants reached a settlement behind the Trustee's back precisely because they knew that the Trustee would object and seek to block it.

The parties' lengthy negotiations also defeat laches. In this case, it is uncontested that negotiations to reach a global settlement commenced in 2009 and continued through the spring of 2012, during which period the Trustee in fact did settle with the Fairfield Funds and was repeatedly assured that the BLMIS estate would be a party to any settlement. "Where plaintiff has not slept on her rights, but has been prevented from asserting them . . . because of ongoing settlement negotiations, the delay is reasonable and the equitable defense of laches will not bar an action." *Stone v. Williams*, 873 F.2d 620, 625 (2d Cir.), *vacated on reh'g on other grounds*, 891 F.2d 401 (2d Cir. 1989) (laches unavailable where defendants lacked clean hands). *See also A.C. Aukerman Co.*, 960 F.2d at 1033 (plaintiff's "negotiations with the accused" excuse delay); *United Merchs. & Mfrs., Inc. v. K. Gimbel Accessories, Inc.*, 294 F. Supp. 151, 153 (S.D.N.Y. 1968) (no laches where the plaintiff engaged in "protracted but unsuccessful settlement negotiations" prior to filing injunction action).

Far from sleep on any rights, the Trustee was engaged in active negotiations to vindicate those rights without the need for additional litigation. Allowing the other parties to those negotiations to take

advantage of them to defeat the Trustee's rights would only reward their inequitable behavior and undermine "the interest of encouraging disputants to settle claims prior to the institution of litigation." *Mogavero v. McLucas*, 543 F.2d 1081, 1083 (4th Cir. 1976).

### D. Laches Does Not Apply to Enforcement of the Automatic Stay

Where a party's claims implicate the automatic stay, "the onus is on the party seeking to proceed to petition the Bankruptcy Court for relief from the stay." *ACandS, Inc. v. Travelers Cas. & Sur. Co.*, 435 F.3d 252, 259 (3d Cir. 2006) (Alito, J.). This is because a Section 362 stay "is automatic in that the debtor does not have to make any formal request that it be issued or that it apply to a particular proceeding." *Id.* This is true even when the property at issue is not yet definitively "property of the estate" because it arguably "has not matured, has no cash surrender value and is otherwise contingent." *Id.* at 260. *See also Shimer v. Fugazy (In re Fugazy Express, Inc.)*, 982 F.2d 769, 776 (2d Cir. 1992) (a party seeking relief from the automatic stay move the bankruptcy court in every instance). The Anwar Plaintiffs cannot argue that laches bars the Trustee's action where it was their obligation alone to seek relief.

Moreover, the district court's finding of prejudice with respect to application of the automatic stay was mistaken, because it misapprehended the nature of the relief sought. While it is black-letter law that a claim violating the automatic stay is void *ab initio*, *Eastern Refractories Co. Inc. v. Forty Eight Insulations Inc.*, 157 F.3d 169, 172 (2d Cir. 1998), the Trustee recognized that the Anwar Plaintiffs' claims here violate the automatic stay only to the extent that they duplicate or impede the Trustee's Recovery Action, and therefore sought a preliminary injunction to remain in force only "until the completion of the Trustee's Action." A-399, (ii). The district court's assumption that the Trustee only sought to have those claims declared void for all time is without any support.

## CONCLUSION

The district court ignored the consequences of its actions for the BLMIS estate, apparently believing that the assets at issue were more important to the Anwar Plaintiffs than Madoff's other victims. *See* SPA-25, n.9. But Congress decided otherwise, when it empowered the Trustee to recover such assets for equitable distribution to all victims, not just those who appeared before the district court.

For the foregoing reasons, this Court should reverse the district court's denial of the Trustee's application for an injunction and remand with instructions to enjoin the Anwar Plaintiffs and Fairfield Defendants from substantially depleting the Fairfield Defendants' assets pending the completion of the Trustee's Recovery Action. In the alternative, the Court should vacate the district court's denial of the Trustee's motion to intervene and final approval of the settlement and order its consideration stayed pending the completion of the Trustee's Recovery Action.

Dated:    April 30, 2013          Respectfully submitted,

/s/   David J. Sheehan
DAVID J. SHEEHAN
DEBORAH H. RENNER
BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, N.Y. 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
dsheehan@bakerlaw.com

DAVID B. RIVKIN, JR.
LEE A. CASEY
MARK W. DELAQUIL
ANDREW M. GROSSMAN
BAKER & HOSTETLER LLP
1050 Connecticut Ave., N.W.
Washington Square, Suite 1100
Washington, D.C. 20036

69

Telephone: (202) 861-1731
Facsimile: (202) 861-1783
drivkin@bakerlaw.com

*Attorneys for Trustee-Appellee*

## **CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 13,703 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

This brief complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in a 14-point proportionally spaced font.

/s/   David J. Sheehan

DAVID J. SHEEHAN

## CERTIFICATE OF SERVICE

I hereby certify that on April 30, 2013, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system. I further certify that I will cause 6 paper copies of this brief to be filed with the Court.

The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

/s/    David J. Sheehan

DAVID J. SHEEHAN